Jon Schuyler Brooks (JB7218)
jbrooks@phillipsnizer.com
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, New York 10103-0084
(212) 977-9700
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

A.W. FINANCIAL SERVICES, S.A., as successor
in interest to TERTIAIRE INVESTISSEMENT, S.A.

                              Plaintiff,

          v.

EMPIRE RESOURCES, INC., AMERICAN STOCK
TRANSFER & TRUST COMPANY, and AFFILIATED
COMPUTER SERVICES, INC.,

                           Defendants.
-----------------------------------------------------------------------x

**ECF CASE –Filed Electronically**


**07-CV-8491 (SHS)(RLE)**

## MEMORANDUM OF LAW OF A.W. FINANCIAL, S.A IN OPPOSITION TO THE MOTION OF DEFENDANT EMPIRE RESOURCES, INC. TO DISMISS THE AMENDED COMPLAINT

        Plaintiff A.W. Financial Services, S.A. ("AWF"), as successor-in-interest to

Tertiaire Investissement, S.A. ("Tertiaire"), respectfully submits this memorandum in opposition

to the motion of defendant Empire Resources, Inc. ("Empire") to dismiss the Amended

Complaint (the "Empire Motion").  Whether by intent or inadvertence, the Empire Motion is

predicated upon multiple misstatements of applicable law.  It must be denied.

### PRELIMINARY STATEMENT

        In a perversion of the old adage, the Empire Motion asks this Court to disregard

the undisputed and indisputable fact that AWF has been harmed, and yet find there is no foul.

The Empire Motion nowhere denies AWF has been harmed; instead, Empire protests (too much, methinks) that it cannot be held liable for the harm.

Those protests, however loud and lengthy, cannot obscure the immutable facts: Empire denied AWF the fair market value of its investment in and ownership of Empire shares. As the Amended Complaint makes plain, in or about October 2004, even though the statutorily-mandated "period of dormancy" had not run; even though Empire (and its agent American Stock Transfer & Trust Co. ("AST")) knew how to contact Tertiaire in Paris, France; Empire – acting directly or through its agents, and without so much as a telephone call to Tertiaire – unilaterally and wrongly determined as a matter of fact and law that Tertiaire "abandoned" 30,426 shares it owned in Empire ("Tertiaire's Empire Shares"). Empire delivered Tertiaire's Empire Shares to the Delaware Escheator, but not in "good faith" as defined in applicable Delaware law. But for actions taken or omissions made by Empire, or attributable to it, that erroneous and improper escheatment *never* would have happened.

The protests have common theme: Empire is cloaked with immunity, absolution, or exculpation from liability for the damages flowing directly from its acts or omissions. It weaves that tale by misstating applicable law, hoping that neither AWF nor this Court takes note.

First, none of AWF's claims "are barred by the plain language" of *the applicable subdivision of* title 12, section 1203, of the Delaware Code. That subdivision provides that the delivery of stock to the State Escheator relieves the holder of liability to the owner *only if* the delivery was made in good faith. 12 Del. C. § 1203(b). The Empire Motion mistakenly relies upon subdivision (a) of section 1203. As the delivery of Tertiaire's Empire Shares was not made in good faith, Empire enjoys no such relief.

2

Second, the Amended Complaint sets forth a proper claim of negligence against Empire, and specifically alleges that Empire "determine[ed] that the Empire shares owned by Tertiaire were dormant for five (5) years," and was negligent in doing so. Furthermore, it alleges that AST was Empire's agent, and that AST made the same determination, and was negligent in doing so. The laws of agency attribute AST's negligence to Empire.

Third, corporations owe no fiduciary duties to shareholders as a class, but do owe fiduciary duties to individual shareholders, including the duty to maintain accurate records. Furthermore, Empire owed fiduciary duties to Tertiaire because of their relationship not only as corporation-shareholder, but also as "holder" and "owner" under Delware escheatment laws.

Fourth, as a matter of Delaware law, and as the Empire Motion admits, Empire was a "holder" of Tertiaire's Empire Shares. A holder exercises dominion and control over the property of the owner. The exercise of such dominion and control in a manner that deprives the owner of its rights in that property is hornbook conversion. Empire did just that in determining Tertiaire's Empire Shares were abandoned and delivering them to the Delaware Escheator.

Fifth, Empire never registered the "replacement" certificate for Tertiaire's Empire Shares in the name of "Tertiaire Development, S.A.," despite instructions to do so from Tertiaire in May 2000. This failure to register may have caused or contributed to AWF's damages.

Sixth, unlike most plaintiffs seeking specific performance of delivery of shares in a corporation, AWF is seeking the ***return*** of shares it already owned in Empire. The Tertiaire Empire Shares are unique, and of unique value to AWF. In such circumstances, Delaware law recognizes an action for specific performance.

As in the centuries-old fairy tale about a fiction perpetrated in another empire, clear-eyed analysis shows the Empire Motion is naked. It must be denied.

3

**STATEMENT OF FACTS**

This statement of facts is drawn from the Amended Complaint and materials outside the record upon which AWF relied in drafting it. This statement of facts also responds to the statement of facts set forth in the Memorandum in Support of Defendant Empire Resources, Inc.'s Motion to Dismiss the Amended Complaint ("Empire Memo") at 3-6.

In January 1994, Tertiaire purchased forty shares of Integrated Technology USA, Inc. ("ITI"). Am. Compl. ¶¶ 1, 7. In connection with purchase, Tertiaire identified itself to ITI's attorney as "a French Investment Company." *See* January 11, 1994 letter from Hervé Debache, President of Tertiaire, to KS Goodwin of the law firm Coleman Rhine, a true and correct copy of which is Exhibit A to the Declaration of Jon Schuyler Brooks, dated June 13, 2008 ("Brooks Decl."). On January 12, 1994, a copy of that letter was sent directly to ITI. Brooks Decl. Ex. B.

Immediately following Tertiaire's purchase of the ITI shares, ITI's counsel recognized Tertiaire was a French company located in Paris. *See* April 28, 1994 letter from Irving L. Rotter of Sidley & Austin to Tertiaire Investissement, Brooks Decl. Ex. C.

In September 1996, in connection with ITI's proposed initial public offering, ITI sent Tertiaire a Questionnaire Regarding NASD Affiliations. It was sent by facsimile to Tertiaire in Paris, France, to the attention of Herve Debache, with the handwritten instruction that it be signed "in the name of Tertiaire Investissement." It was so signed, and the address given was Paris, France. *See* Brooks Decl. Ex. B.

In September 1999, ITI merged with and into Empire, a Delaware corporation with its principal place of business in New Jersey, with the name of the surviving company being Empire. As a result of the merger, the 40 shares of ITI owned by Tertiaire ultimately became 30,426 shares of Empire. Am. Compl. ¶¶ 8, 9.

In or about April 2000, Tertiaire (by then known as Tertiaire Development, S.A.) wrote to Empire inquiring about its shares. In response to that inquiry, on May 4, 2000, Defendant AST wrote to Tertiaire to "acknowledge your recent letter regarding the loss of the above certificates [IT0065], against which we have placed a "STOP TRANSFER" notation on our records." In fact, Tertiaire never had received (and therefore did not lose) certificate IT0065. Am. Compl. ¶¶ 10-12.

Nonetheless, as a condition of providing a replacement certificate AST required Tertiaire to execute an Affidavit of Loss and Indemnity Agreement, and to purchase a surety bond with a premium in the amount of $1,003.84. Tertiaire complied with AST's demands. Am. Compl. ¶¶ 13-14.

In the Affidavit of Loss and Indemnity Agreement dated May 22, 2000, Tertiaire stated explicitly that it was "presently known as Tertiaire Development, S.A.," stated its address as "47 Rue de Chaillot, Paris 75116," and its telephone number as "01 56 62 2100." It was signed by "H. Debache" in his capacity as "President of Tertiaire *Development*, S.A." On or about May 30, 2000, Defendant Empire issued a replacement certificate, number IT0328. Defendant AST sent the replacement certificate to Tertiaire. Am. Compl. ¶¶ 15-16.

On or about October 20, 2004, Empire – either directly or through AST, its authorized agent – delivered to the State of Delaware as unclaimed (escheated) property the Empire shares owned by Tertiaire. In or about February 2005, the State of Delaware (directly or through ACS) sold the Empire shares as follows:

- 5,426 shares at $4.0395/share (February 2, 2005); and

- 25,000 shares at $3.8133/share (February 3, 2005).

Am. Compl. ¶¶ 17-18.

On or about March 29, 2006, Tertiaire – by then known as AWF – wrote to Empire requesting that the Empire shares owned by Tertiaire be re-registered in the name of AWF.  AWF maintained the same address, telephone, and facsimile numbers as its predecessors-in-interest, Tertiaire and Tertiaire Development.  In or about April 2006, through serial conversations and correspondence with Empire, AST and ACS, AWF learned for the first time that the Empire shares owned by Tertiaire had been escheated by Empire to the State of Delaware.  Am. Compl. ¶¶ 19-21.

Between February 2005 and March 2006, the market value of the Empire shares rose from approximately $4 per share to $32.61 per share.  On May 3, 2006, Empire shares traded at $57.87 per share.  Am. Compl. ¶ 22.

6

**ARGUMENT**

**I.**

**THE RULES OF CIVIL PROCEDURE
BAR THE EMPIRE MOTION TO DISMISS**

AWF commenced this matter on September 28, 2007.  (Docket No. 1.)  Service of Process was completed on October 10, 2007.  (Docket Nos. 4-6.)  Responsive pleadings were due on October 30, 2007.  Fed. R. Civ. P. 12(a)(1)(A)(i).

Defendant Empire did not appear, answer or otherwise move in response to the Complaint on or before October 30, 2007.  On or about March 6, 2008, Empire's counsel first contacted AWF's counsel, at which time it requested an extension of time to answer the Complaint.  AWF consented to the requested extension and so stipulated.  (Docket No. 24.)  Empire answered the Complaint on March 19, 2008, more than five months after being served.  (Docket No. 25.)

Defendant AST, through counsel, requested an extension of time through November 30, 2007, to answer or otherwise move in response to the Complaint.  AWF consented to the request.  (Docket No. 8.)  AST answered the Complaint on November 30, 2007.  (Docket No. 13.)

Defendant ACS, through counsel, requested an extension of time through December 7, 2007, to answer or otherwise move in response to the Complaint.  AWF consented to the request.  (Docket No. 10.)  ACS moved to dismiss the Complaint on December 7, 2007.  (Docket No. 14.)

Neither Empire nor AST filed a Rule 12(b) motion prior to filing an Answer.  They thereby lost its ability to file such a motion.  Fed. R. Civ. P. 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed.").

7

AWF filed an Amended Complaint on April 4, 2008.  (Docket No. 28.)  "[A]n amendment to the pleadings permits the responding pleader to assert only such of those defenses which may be presented in a motion under Rule 12 as were not available at the time of his response to the initial pleading."  *Ross v. U.S.*, 574 F.Supp. 536, 539 (S.D.N.Y. 1983); *accord*, *Sears Petroleum & Transport Corp. v. Ice Ban America, Inc.*, 217 F.R.D. 305, 307 (N.D.N.Y. 2003) (if an "amended complaint also contains new matter, the defendant may bring a second motion under Rule 12 to object to the new allegations only") (citation omitted).

Empire cannot now bring a Rule 12(b) motion to dismiss because all the claims against Empire in the Amended Complaint were made also in the original complaint.  *Compare* Complaint *with* Amended Complaint.  None of the changes to the original Complaint affect Empire meaningfully or substantively.  *See* Empire Memo at 12 n.5 (the only change "from the allegations of the original Complaint … is the addition of the [phrase] '*[p]rior* to the time the Empire shares owned by Tertiaire were paid to the State Escheator ….'" (emphasis, brackets, and ellipses in original).

The Empire Motion is untimely.  It must be denied.

## II.

### CHOICE OF LAW

For purposes of the Empire Motion, AWF takes no position as to choice of law.

### III.

### DELAWARE LAW DOES NOT BAR ANY CLAIM BY AWF AGAINST EMPIRE

#### A.    Introduction

The Empire Motion states falsely that AWF "seeks to hold Empire liable … for what plaintiff claims was the premature escheatment of its Empire stock to Delaware …."

8

Empire Memo at 9.  In fact, *none* of AWF's claims seeks to hold Empire – or its co-defendants – liable *for* the unquestionably premature escheatment; rather, *all* of AWF's claims seek to hold Empire and the other defendants liable for their respective predicate acts (or omissions) that *resulted in* the premature escheatment and AWF's damages.

Empire, however, attempts to recast the nature of AWF's claims in a transparent attempt to avail itself of a statutory bar to recovery provided in some instances by the Delaware escheatment statute.  Empire Memo at 9 (*citing* 12 Del. Code § 1203(a)).  Even if AWF's claims were based solely on the premature escheatment of Tertiaire's Empire Shares, the bar provided by Section 1203(a) would not apply because – as demonstrated conclusively by the history of Section 1203, subsection (a) does not apply to situations such as the one before the Court involving the escheatment of shares in a corporation.

**B.      History of Section 1203**

In 1971, Delaware added Subchapter IV, entitled "Other Unclaimed Property," to its escheat statutes.  58 Del. Laws, c. 275, § 1.  This amendment to Title 12 of the Delaware Code added sections 1197 through 1202.  Section 1197 explained the subchapter applied to

> [a]ll property, as hereinafter defined, and not otherwise subject to escheat in accordance with this chapter, the title to which has failed and the power of alienation suspended by reason of , (a) the death of the owner thereof, intestate, leaving no known heirs-at-law; (b) the owner thereof having disappeared or being missing from his last known place or residence for a continuous period of 7 years or more, leaving no known heirs-at-law; or (c) the same having been abandoned by the owner thereof, as hereinafter defined, shall descend to the State of Delaware in accordance with the Constitution, the general laws of this State, or the provisions of this Act.

*Ibid*.

"Property" was defined in Section 1198(b) to include "(3) stocks, bonds and other securities."  "Abandoned" was not separately defined; "abandoned property," however, was defined in Section 1198(3) to mean "property against which a full period of dormancy has run."

9

"Full period of dormancy" was defined in Subsection (f) to mean "the full and continuous period of 7 years … during which an owner has ceased, failed, or neglected to exercise dominion or control over his property or to assert a right of ownership or possession; … or to do any other act in relation to or concerning such property." 58 Del. Laws, c. 275, § 1 (1971).

As adopted in 1971, Subchapter IV did *not* include Section 1203 or any other provision relieving holders from liability. *See* 58 Del. Laws, c. 275, § 1 (1971). Within a year of enacting Subchapter IV, however, the same session of the Delaware legislature amended it to add, among other things, Section 1203. 58 Del. Laws, c. 426, § 8 (1972). *Cory v. Tampax Inc.*, 1976 WL 1707 *4 (Del. Chancery Apr. 30, 1976) (Section 1203 was "added by amendment on June 15, 1972, to the existing [Delaware] escheat statutes").

As adopted in 1972, Section 1203 read:

**Relief from liability**

> The payment or delivery of property to the State Escheator by any holder shall terminate any legal relationship between the holder and the owner and shall release and discharge such holder from any and all liability to the owner, his heirs, personal representatives, successors and assigns by reason of such delivery or payment, regardless of whether such property is in fact and in law abandoned property and such delivery and payment may be pleaded as a bar to recovery and shall be a conclusive defense in any suit or action brought by such owner, his heirs, personal representatives, successors and assigns or any claimant against the holder by reason of such delivery or payment.

58 Del. Laws, c. 426, § 8 (1972). At that time, Section 1203 was a provision with *no* subsections whatsoever.

Section 1203 remained unchanged until 1986, when the Delaware legislature overhauled Subchapter IV to address one single issue: "To Provide for the Escheat to the State of Intangible Ownership Interests in Corporation when Dividends or other Distributions thereon

have been Abandoned." 65 Del. Laws, c. 351 (1986). That overhaul amended five provisions of Subchapter IV:

- it replaced the phrase "stocks, bonds or other securities" in the definition of "property" with "intangible ownership interests in corporations, whether or not represented by a stock certificate" (65 Del. Laws, c. 351, § 3 (1986));

- it redefined "holder" to include "the issuer of any intangible ownership interest in a corporation" (65 Del. Laws, c. 351, § 1 (1986));

- it established a separate, three-part definition of "full period of dormancy" applicable only to intangible ownership interests in a corporation (65 Del. Laws, c. 351, § 2 (1986));

- it restricted holders of intangible ownership interests in a corporation from delivering such interests unless each part of the "full period of dormancy" definition was satisfied and, in the case of certificated securities, further required such holders to deliver *either* the original stock certificate if in their possession *or* a duplicate of it (65 Del. Laws, c. 351, § 4) (1986)); and

- it limited the ability of holders of intangible ownership interests in a corporation who do not possess the *original* stock certificate to invoke the Section 1203 "relief from liability" by imposing upon them the burden of delivering the duplicate certificate in "good faith," a phrase it defined through a three-part test (65 Del. Laws, c. 351, § 5 (1986)).

This comprehensive, integrated approach to the escheatment of intangible ownership interests in a corporation – such as AWF's ownership interest in 30,426 Empire shares – remains materially

unchanged two decades later, and applies to this case.  *Compare*  65 Del. Laws, c. 351, §§ 1-5 (1986) *with* 12 Del. Code §§ 1198(7), 1198(9)a.1-3; 1198(11)(iii), 1201(a)(1), & 1203(b)-(d).[1]

The 1986 amendments fundamentally altered Section 1203:  the text of pre-1986 Section 1203 was designated subsection (a), and new subsections (b), (c) and (d) were added.

(b) Upon the delivery ***in good faith*** of a duplicate certificated security to the State Escheator or the registration of an uncertificated security to the State Escheator pursuant to § 1201 hereof, the holder and any transfer agent, registrar or other person acting for or on behalf of the holder in executing or delivering such duplicate certificate or effectuating such registration, is relieved of all liability of every kind to every person, including any person acquiring the original of a certificated security or the duplicate of a certificated security issued to the State Escheator, for any losses or damages resulting to any person by issuance and delivery to the State Escheator of the duplicate certificated security or the registration to the his name of an uncertificated security.

(c) If the holder pays or delivers property to the State Escheator in good faith and thereafter another person claims the property from the holder or another state claims the money or property under its laws relating to escheat or abandoned or unclaimed property, the State Escheator acting on behalf of the State, upon written notice of the claim, shall defend the holder against the claim and indemnify the holder against any liability on the claim.

(d) For the purposes of this section, "good faith" means that:

(1) Payment or delivery was made in a reasonable attempt to comply with this Act;

---

[1] The 1986 amendments were taken, almost verbatim, from the Uniform Unclaimed Property Act (1981) ("UUPA(1981)").  *See*  UUPA(1981) §§ 1(10)(iii), 10, 19(d), 20(e) & 20(f)(1)-(3).  As explained by the drafters:

The 1966 Act provided a presumption of abandonment of unclaimed dividend or interest checks but arguably did not cover the underlying ownership interest represented by issued and outstanding securities certificates. In recent years several states have amended their statutes to authorize taking of this property and indications are that the trend is likely to continue. California, Florida, Indiana, Maine, Massachusetts, Montana, Rhode Island and Virginia have statutes with such provisions and other states are known to be considering similar proposals. ***The new Act specifically covers securities even though they are not in the possession of the issuer***. See Section 10.

UUPA(1981) at 7 (emphasis added).

(2) The person delivering the property was not a fiduciary then in breach of trust in respect to the property and had a reasonable basis for believing, based on the facts then known to him, that the property was abandoned for the purposes of this subchapter; *and*

(3) There is no showing that the records pursuant to which the delivery was made did not meet reasonable commercial standards of practice in the industry.

65 Del. Laws, c. 351, § 5 (1986) (emphases added).

This history demonstrates that Section 1203(a) does ***not*** apply to the facts of this case in which the property improperly escheated to the State was an intangible ownership interest in a corporation: Tertiaire's Empire Shares.

The history of Section 1203, however, is not the only basis for reaching this conclusion. Another is the language of Section 1203. Whereas Section 1203(a) appears to provide holders of other types of property with a "bar to recovery" and "a conclusive defense," Section 1203(c) offers holders of intangible ownership interests in a corporation only the protection of the State's duty to defend against the claims of others and indemnify for any liability. *Compare* 12 Del. Code § 1203(a) *with* 12 Del. Code § 1203(c). Obviously, if the Section 1203(a) "bar to recovery" and "conclusive defense" applied to matters such as this one involving the escheatment of shares, holders of such shares never would be exposed to any potential liability and there would be nothing for the State to indemnify, even theoretically. Such an interpretation of Section 1203(a) would negate the express language of Section 1203(c), and that possibility is precluded by general rules of statutory construction.

**C.      Section 1203(b) Applies to this Case**

To the extent, if any, that Section 1203 applies here, the appropriate provision is not subsection (a), but subsection (b). Indeed, Empire concedes that Section 1203(b) "is directed at situations where <u>duplicate</u> stock certificates are escheated to the state ...." Empire Memo at

13

10 (underscoring in original).  Empire concedes further that the facts here present precisely such a situation.  "[I]t appears that ***Section 1203(b) does apply here*** because the certificate that was escheated was a replacement certificate."  Empire Memo at 11 (emphasis added).[2]

**D.    Section 1203(b) Requires Good Faith**

Empire concedes still further that Section 1203(b) imposes on its face an absolute requirement that delivery of the duplicate stock certificate to the Delaware Escheator be made in good faith.  "[T]he statute provides in Section 1203(b) that the escheatment of duplicate certificates ***must be done in good faith*** for the claim bar to apply."  Empire Motion at 11 (emphasis added); *see* 12 Del. Code § 1203(b).  This requirement appears in the UUPA(1981) from which Sections 1203(b)-(d) were drawn.  UUPA(1981) §§ 19(d), 20(e), & 20(f).  "When property is turned over to the state, the holder is relieved of all liability for any turnover ***made in good faith***."  UUPA(1981) § 20 Comment (emphasis added).

Notwithstanding its multiple concessions regarding the applicability of Section 1203(b) to the facts presented by this case, Empire makes no attempt to demonstrate that it satisfied any – let alone all – of the elements of the three-prong "good faith" test set forth in Section 1203(d).  *See generally*, Empire Memo at 9-12; *see also* 12 Del. Code § 1203(d).[3]

**E.    Empire Cannot Satisfy the Section 1203(b) Good Faith Test**

**1.    "Reasonable Attempt to Comply" with Subchapter IV**

---

[2] As alleged in the Amended Complaint, Empire (through its authorized agent AST) sent the ***original*** stock certificate to AWF on May 30, 2000.  Am. Compl. ¶ 16.  Accordingly, neither Empire nor AST possessed the ***original*** stock certificate after that date.  Pursuant to Section 1201(a)(1), Empire (directly or through AST) caused a ***duplicate*** stock certificate to be made and delivered to the Delaware Escheator.  *See* 12 Del. Code § 1201(a)(1).  Empire's co-defendants, AST and Affiliated Computer Services, Inc. ("ACS"), likewise concede this point.  Defendants American Stock Transfer & Trust Co. and Affiliated Computer Services, Inc.'s Memorandum of Law in Support of Motion to Dismiss ("AST-ACS Memo") at 11 ("the only reasonable inference is that the delivery of Plaintiff's Empire shares to the State of Delaware was accomplished by delivery of a duplicate certificated security."); *see* Am. Compl. ¶¶ 16, 17.

[3] Empire acknowledges that AWF always has taken the position that the delivery of Tertiaire's Empire shares to the Delaware Escheator was required to, but did not, satisfy the Section 1203(d) good faith test.  Empire Memo at 10 (plaintiff asserted in Court that the "good faith" requirement set forth in Section 1203(b) applied to this case).

14

The first element of the good faith test requires the holder (Empire) to demonstrate that the delivery of Tertiaire's Empire Shares to the Delaware Escheator "was made in a reasonable attempt to comply" with the provisions of Subchapter IV.  12 Del. Code § 1203(d)(1).  Empire cannot so demonstrate.

Intangible ownership interests in a Delaware corporation may be delivered to the State Escheator *only* as, when, and if they are deemed abandoned under Subchapter IV.

> (a) On or before the date required for the filing of the report pursuant to § 1199 of this title, every holder of abandoned property shall pay or deliver to the State Escheator all abandoned property specified in the report ….  The holder of any intangible ownership interest in a corporation *deemed abandoned under this subchapter* shall, when making the delivery contemplated by this section:
>   (1) If such interest is a certificated security as defined in § 8-102(a) of Title 6 deliver either the original stock certificate *evidencing the abandoned property*, if such is in its possession or a duly issued replacement certificate evidencing such property in a form suitable for transfer.

12 Del. Code § 1201(a)(1) (emphases added).  Property is abandoned *only* as, when, and if a "full period of dormancy has run."  12 Del. Code § 1198(1).  Delaware law provides that,

> with respect to an intangible ownership interest in a corporation, whether or not represented by a stock certificate, *the period of dormancy means a period of 5 years* during which:
>
>   1. The owner has not claimed a dividend, distribution or other sum with respect to such interest;
>
>   2. *The owner has not communicated in writing with the holder concerning such property* or otherwise communicated with the holder concerning such property which communication is evidenced by a writing or other record prepared by the holder or its employee in the ordinary course of business; *and*
>
>   3. At the end of which *the holder does not know the current location* of the owner of such property.

15

12 Del. Code § 1198(9)a. (emphases added).  Each of these three conditions must be met.  None

of them had been – and none of them could have been – met at the time Empire delivered

Tertiaire's Empire Shares to the Delaware Escheator.

> **(A)     No Period of Dormancy as to Dividends**

The first condition is that an owner has not claimed a dividend in five years.  12

Del. Code § 1198(9)a.1.  This condition is taken from Section 10(a) of the UUPA(1981).[4]  The

drafters of the UUPA(1981) explained the purpose of this condition.

> The existing underlying shares statutes make no formal distinction
> between dividend and nondividend paying stock and provide that the mere
> passage of time with no contact is sufficient to raise the presumption of
> abandonment.  Section 10 combines both a period of inactivity, 7 years,
> with the requirement that distributions paid on the underlying intangible
> interest remain unclaimed, thus avoiding concerns that ***abandonment
> should not be presumed where a shareholder has not contacted a non-
> dividend paying company***.

UUPA(1981) § 10, Comment.  In other words, the five-year period of dormancy starts to run

*only* when an owner fails to claim a declared and distributed dividend.

Empire first declared a dividend on June 19, 2003.[5]  Consequently, the five-year

"period of dormancy" did not expire until June 18, 2008.

---

[4] Section 10(a) provides:

> [S]tock or other intangible ownership interest in a business association, the existence
> of which is evidenced by records available to the association, is presumed abandoned
> and, with respect to the interest, the association is the holder, if a dividend, distribution,
> or other sum payable as a result of the interest has remained unclaimed by the owner for
> 7 years and the owner within 7 years has not:
>> (1) communicated in writing with the association regarding the interest or a
>> dividend, distribution, or other sum payable as a result of the interest; or
>> (2) otherwise communicated with the association regarding the interest or a
>> dividend, distribution, or other sum payable as a result of the interest, as evidenced
>> by a memorandum or other record on file with the association prepared by an
>> employee of the association.

UUPA(1981) § 10(a).  Delaware originally adopted the seven-year standard, but amended it to five years in 1988.
*Compare* 65 Del. Laws, c. 351, § 2 (1986) *with* 66 Del. Laws, c. 379, § 3 (1988).

16

As a matter of fact, Empire can neither claim nor demonstrate that, as of the time it delivered Tertiaire's Empire Shares to the Delaware Escheator in October 2004, a period of five years had run during which Tertiaire failed to claim dividends. Upon these facts, as a matter of law, Empire is unable to satisfy this first condition; its inability to do so means a full period of dormancy had ***not*** run against Tertiaire's Empire Shares at the time Empire delivered them to the Delaware Escheator. 12 Del. Code § 1198(9)a.1.

In the absence of a full period of dormancy, Tertiaire's Empire Shares cannot be deemed abandoned. 12 Del. Code § 1198(1). Their delivery to the Delaware Escheator in October 2004, therefore, violated the most basic provisions (and protections) of Subchapter IV. Accordingly, their delivery was not made in a reasonable attempt to comply with the requirements of Subchapter IV. 12 Del. Code §§ 1201(a)(1), 1203(d)(1).

### (B)     No Period of Dormancy as to Communications

Even assuming *argendo* that Empire could satisfy the first condition, it cannot satisfy the second one: the owner (Tertiaire) has not communicated in writing with the holder concerning such property for a continuous period of five years. 12 Del. Code § 1198(9)a.2. This condition is taken from Section 10(a)(1) and Section 10(a)(2) of the UUPA(1981).[6]

Tertiaire and Empire exchanged correspondence regarding Tertiaire's Empire Shares in April and May, 2000, culminating in Empire's authorized agent, AST, sending Tertiaire a replacement stock certificate (No. IT 0328) on May 30, 2000. Am. Compl. ¶¶ 16-17.

---

[5] In 2002, Empire stated, "The Company has never paid any dividends on its common stock and expects for the foreseeable future to retain all of its earnings from operations for use in expanding and developing its business." Empire Resources, Inc. 2002 Annual Report on Form 10-K at p.6, *available at* http://sec.gov/Archives/edgar/data/1019272/000095011703001235/a34874.txt. In 2003, Empire stated, "On June 19, 2003 the Board of Directors of the Company declared its first ever dividend on its common stock." Empire Resources, Inc. 2003 Annual Report on Form 10-K at p.10 http://sec.gov/Archives/edgar/data/1019272/000095011704001197/a37377.txt

[6] For the text of these subsections, see footnote 4 *supra*.

By operation of these facts, a full period of dormancy could not have run against Tertiaire's Empire Shares prior to May 31, 2005. 12 Del. Code § 1198(9)a.2.

Tertiaire's Empire Shares, therefore, as a matter of law could not be deemed abandoned at anytime prior to May 31, 2005. 12 Del. Code § 1198(1). Their delivery by Empire to the Delaware Escheator in October 2004 violated the most basic provisions (and protections) of Subchapter IV. Accordingly, their delivery was not made in a reasonable attempt to comply with Subchapter IV. 12 Del. Code §§ 1201(a)(1), 1203(d)1.

**(C)    No Period of Dormancy as to Whereabouts**

Even assuming *arguendo* that Empire could satisfy the first and second conditions and demonstrate in fact and law that a full five-year period of dormancy had run prior to the delivery of Tertiaire's Empire Shares to the Delaware Escheator in October 2004, it nonetheless cannot satisfy the third one: at the end of the five-year period, the holder does not know the current location of the owner. 12 Del. Code § 1198(9)a.3.

Empire, no doubt, will argue disingenuously that, according to its share registry, Tertiaire's last known address was in Israel, that dividend checks sent to that address beginning in 2003 had been returned to Empire, and that it would have been futile to send notice to a "bad" address.[7] Even if such an argument were predicated upon accurate facts, it would be invalid here because, unlike other sections of Subchapter IV, Section 1198(9)a.3. does not use "last known address … appearing from the records of the holder" as the standard to define, delimit and determine the holder's knowledge of the owner's whereabouts. *See* 12 Del. Code § 1199(a)(1). Instead, it requires a holder to prove affirmatively that "the holder ***does not know the current***

---

[7] Empire already has hinted at its intention of making this argument. *See* Empire Memo at 4-5 (stating that in May 2000, when Tertiaire (in response to Empire's demand) provided an Affidavit of Loss and Indemnity Agreement, it "failed to check a box on that Agreement to denote that this [current] address [in France shown thereon] was meant to be a permanent address change (from its prior address in Israel)," and implying that because of this "failure" Empire did not change Tertiaire's address in its share registry.

*location* of the owner of the property."  12 Del. Code § 1198(9)a.3.  Empire's "knowledge" of

that location derives not only from an entry in its stock ledger, but also from the collective

knowledge of its officers and agents.  *See*, *e.g.*, *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1062 n.83

(Del.Ch. 2004) (*citing* 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private

Corporations § 790-91, at 14-18 (perm. ed., rev. vol. 2002) (stating the general rule that "a

corporation is charged with constructive knowledge, regardless of its actual knowledge, of all

material facts of which its officer or agent receives notice or acquires knowledge while acting in

the course of employment within the scope of his or her authority, even though the officer or

agent does not in fact communicate the knowledge to the corporation")).

        Empire knew the "current location" of Tertiaire since at least May 2000.  Empire

concedes that since that time it had in its possession, custody or control an "Affidavit of Loss and

Indemnity Agreement" executed at its request by Tertiaire.  Empire Memo at 4-5.  Indeed,

Empire introduces that very document "in support of" the Empire Motion (although the Empire

Memo neither explains how the document does so nor relies upon it in any of its arguments).

Declaration of Deborah A. Maher in Support of Defendant Empire Resources, Inc.'s Motion to

Dismiss the Amended Complaint, dated May 2, 2008 ("Maher Decl."), Ex. 1.  Empire concedes

further that this document "stated that Tertiaire was 'presently known as Tertiaire Development,

S.A.,' stated its address as '47 Rue de Chaillot, Paris 75116,' and its telephone number as '01 56

62 2100.'"  Empire Memo at 4-5 (*citing* Am. Compl. ¶ 15); Maher Decl., Ex. 1.

        No later than May 2000, from the correspondence leading up to the Affidavit of

Loss and Indemnity Agreement, Empire knew that the initial Empire stock certificate issued to

Tertiaire – which Empire apparently sent to Israel (*see* Empire Memo at 5) – never reached

Tertiaire.  Empire therefore knew or should have known that the address in Israel was a "bad"

address.  Furthermore, as of May 2000, Empire knew that Tertiaire had a "good" address in France, and that the address in France was different from and more current than Tertiaire's "prior address in Israel."  Empire Memo at 5.[8]  Since May 2000, and through the present day, Tertiaire and its successor-in-interest, AWF, retained that same address and telephone number in France. Am. Compl. ¶ 20.

In 2004, Empire knew Tertiaire's "current location."  (Despite that knowledge, Empire made no attempt to provide the requisite notice to Tertiaire at its current location.)  A full five-year period of dormancy could not have run against Tertiaire's Empire Shares at any time subsequent to May 2000, so long as Tertiaire or its successor-in-interest, AWF, remained at the location in Paris disclosed to Empire at that time.  12 Del. Code § 1198(9)a.3.  Tertiaire's Empire Shares, therefore, as a matter of law, could not be deemed abandoned.  12 Del. Code § 1198(1). Their delivery by Empire to the Delaware Escheator in October 2004 violated the most basic provisions (and protections) of Subchapter IV.  Accordingly, their delivery was not made in a reasonable attempt to comply with Subchapter IV.  12 Del. Code §§ 1201(a)(1), 1203(d)1.

*                    *                    *                    *

Empire cannot satisfy all three conditions precedent imposed by Delaware law to a determination that a full five-year period of dormancy had run against Tertiaire's Empire Shares as of the time Empire delivered them to the Delaware Escheator.  Consequently, Empire cannot prove that their delivery was made in a reasonable attempt to comply with Subchapter IV. 12 Del. Code §§  1201(a)(1); 1203(d)(1).  Empire's inability to do so means the delivery was not made in good faith.  12 Del. Code §§ 1203(b), 1203(d)(1).  Accordingly, Section 1203(b) does not provide any immunity, indemnity or other relief to Empire, and does not bar any of AWF's claims.

---

[8] The Empire Motion provides no support or explanation for its statement that Tertiaire's prior address was in Israel.

1047530.1

**2.    "Reasonable Basis for Believing Property Abandoned"**

The second element of the good faith test requires the holder (Empire) to demonstrate that, at the time it delivered Tertiaire's Empire Shares to the Delaware Escheator, it was not a fiduciary then in breach of trust in respect to the property, and had a reasonable basis for believing, based on the facts then known to it, that the property was abandoned for the purposes of Subchapter IV.  12 Del. Code § 1203(d)(2).  Empire cannot so demonstrate.

Regardless whether Empire was a fiduciary, it cannot satisfy this element because it had no reasonable basis to believe the Tertiaire Empire Shares were abandoned as determined by Subchapter IV.  Empire's own records demonstrate that, in May 2000, it sent the replacement certificate for Tertiaire's Empire Shares to Tertiaire in Paris, France.  As discussed above, these facts make it impossible that the full five-year period of dormancy had run against Tertiaire's Empire Shares at the time Empire delivered them to the Delaware Escheator.  Absent a full period of dormancy, Empire had no reasonable basis to believe Tertiaire's Empire Shares were abandoned for purposes of Subchapter IV.

Empire's lack of a reasonable basis means the delivery of Tertiaire's Empire Shares to the Delaware Escheator was not made in good faith.  12 Del. Code §§ 1203(b), 1203(d)(2).  Accordingly, Section 1203(b) does not provide any immunity, indemnity or other relief to Empire, and does not bar any of AWF's claims.

**3.    "Reasonable Commercial Standards of Practice"**

The third element of the good faith test requires the holder (Empire) to demonstrate that the records pursuant to which the delivery was made met reasonable commercial standards of practice in the industry.  12 Del. Code § 1203(d)(3).  Although discovery has yet to commence, AWF believes that Empire cannot so demonstrate.

21

Empire's records failed so miserably to conform to the reasonable commercial standards of the industry that, in reliance upon them, Empire determined wrongly that a full five-year period of dormancy had run against Tertiaire's Empire Shares, and concluded erroneously that Tertiaire was in Israel rather than France.

This failure means the delivery of Tertiaire's Empire Shares to the Delaware Escheator was not made in good faith.  12 Del. Code §§ 1203(b), 1203(d)(3).  Accordingly, Section 1203(b) does not provide any immunity, indemnity or other relief to Empire, and does not bar any of AWF's claims.

## IV.

### THE AMENDED COMPLAINT STATES A CLAIM FOR NEGLIGENCE

In making the argument that the Amended Complaint fails to state a claim for negligence, the Empire Motion contradicts itself and ignores fundamental principles of both corporate law and the law of agency.  For example, it argues that "the Amended Complaint does not state a claim against Empire in negligence because no breach of duty is adequately alleged." Empire Memo at 13.  The Empire Motion then immediately reverses itself:  buried in a footnote, Empire concedes that the "Amended Complaint does allege that Empire had a duty to Tertiaire 'to account properly for the status of shares.'"  *Id*. at 13 n.6 (*citing* Am. Compl. ¶ 26).  Elsewhere in the Empire Motion, Empire concedes also that the Amended Complaint alleges that Empire had a "duty to Tertiaire to maintain accurate books and records regarding ownership of shares." Empire Memo at 14 (*citing* Am. Compl. ¶ 46).  Empire then acknowledges that a corporation has an affirmative duty to maintain a stock ledger.  *Id*. (*citing Rainbow Navigation, Inc. v. Pan Ocean Navigation, Inc.*, 535 A.2d 1357, 1359 (Del. 1987)).

22

General principles of corporate law impose upon corporations other duties to their shareholders, including the duty of care. The Court may infer the existence of each of those duties from the Amended Complaint given that it alleges Tertiaire owned 30,426 Empire shares, establishing the relationship of corporation and shareholder as between Empire and Tertiaire. Am. Compl. ¶¶ 1, 2, & 7-9.

Furthermore, in enacting the 1986 amendments to Subchapter IV of the Delaware escheatment statutes, the Delaware legislature imposed upon corporations certain other duties to their shareholders, all of which are designed to protect the shareholder and prevent premature or improper delivery of shares to the Delaware Escheator. Sections 1198(9)a.1. and 1198(9)a.2., for example, impose a duty to maintain accurate records of not only dividend payments and whether they are claimed, but also communications between shareholder and corporation. They exist to prevent a premature determination that the full five-year period of dormancy has run. Section 1198(9)a.3. imposes a duty to provide written notice prior to escheatment so as not to deprive the shareholder of its opportunity to prevent a negligent determination of abandonment.[9] *See* 12 Del. Code §§ 1198(9)a. The Amended Complaint references the former duty explicitly, and implicitly references the latter one. Am. Compl. ¶¶ 26-27. In making its determination that a full five-year period of dormancy had run against Tertiaire's Empire Shaires, Empire breached each of those duties. Am. Compl. ¶ 27.

---

[9] As stated previously, Sections 1198(9)a.1 and 1198(9)a.2 were drawn from Section 10 of the UUPA(1981) (the section pertaining to intangible ownership interests in a corporation) *Compare* 12 Del. Code §§ 1198(9)a.1-2 *with* UUPA(1981) § 10(a)(1)-(2). Section 1198(9)a.3., however, does not have a parallel in the text of Section 10 of the UUPA(1981). The Delaware legislature apparently relied upon a Comment to Section 10 of the UUPA(1981) to impose this third condition precedent to a determination that a full five-year period of dormancy had run.

> If the conditions leading to a presumption of abandonment have occurred, the holder (issuer of the security) must report to the state pursuant to Section 17, **and if the holder has in its records an address of the owner, it must send written notice to the owner in an effort to reunite the owner with his property**.

UUPA(1981) § 10, Comment (emphasis added). Section 1198(9)a.3., therefore, is a notice requirement.

Empire also states falsely that the Amended Complaint "does not allege that Empire played an actual role in, or even had knowledge about, the escheatment of Teritiaire's Empire stock." Empire Memo at 12. In reality, the Amended Complaint specifically alleges that "*Empire* – either directly or through AST, its authorized agent – delivered to the State of Delaware as unclaimed (escheated) property the Empire shares owned by Tertiaire." Am. Compl. ¶ 17 (emphasis added). It alleges also that "Empire was negligent in determining that the Empire shares owned by Tertiaire were dormant for five (5) years." Am. Compl. ¶ 27.

Empire's "role in … or knowledge about the escheatment of Tertiaire's stock" is determined by looking not only at Empire, but also at its agents because their acts, omissions, and knowledge are attributed to Empire by principles of the law of agency. "It is certainly true that a principal is liable for wrongs committed by its agents acting in the course of their agency." *Arnold v. Society for Sav. Bancorp*, 678 A.2d 533, 539 (Del. 1996) (citation omitted); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1062 n.83 (Del.Ch. 2004) (*citing* 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 790-91, at 14-18 (perm. ed., rev. vol. 2002) (stating the general rule that "a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation")). Accordingly, the Amended Complaint alleges that AST was Empire's authorized agent, and that AST committed certain acts, omitted certain others, and acquired information pertaining to Tertiaire, all of which caused or contributed to the damages suffered by Tertiaire. Am. Compl. ¶¶ 3, 10-17, 21, & 23-28.

In a transparent last-ditch effort, Empire suggests that the Amended Complaint fails to allege that "Empire's actions were the proximate cause of any damages suffered by plaintiff." Empire Memo at 13. Count I of the Amended Complaint, however, makes precisely that charge: "By reason of Empire's negligence, AWF has been damaged …." Am. Compl. ¶ 28.

Empire then argues that there is a disconnect between its negligence, which occurred prior to the escheatment, and AWF's damages, because AWF suffered no injury "other than that allegedly resulting from the escheatment itself," and then bootstraps its argument to conclude the Amended Complaint "fails to allege proximate cause." *Ibid*.

"Delaware follows the 'but for' rule of proximate cause." *Pesta v. Warren*, 2005 WL 3453825 at *2 & n.7 (Del. Dec. 14, 2005) (*citing Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991) (defining the "but for" rule as "[t]he defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it")). But for Empire's negligent determination that a full five-year period of dormancy had run against Tertiaire's Empire Shares, those shares never would have been delivered to the Delaware Escheator, and Tertiaire/AWF never would have suffered damages. Am. Compl. ¶¶ 27-28.

Additionally, Empire errs in claiming that AWF suffered no injury other than that allegedly resulting from the escheatment itself. In fact, Empire's acts and omissions caused Tertiaire/AWF to suffer the loss of an opportunity, a recognized injury. *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1090 (Del. Ch. 2004); *see also Carlton v. Choice Point*, 450 F. Supp.2d 489, 496-97 (D.N.J. 2006), *vacated in part on other grounds*, 482 F. Supp.2d 533 (D.N.J. 2007) (shares in corporation had been diverted by transfer agent to third party; during third party's

possession, shares reached highest value; court held that rightful owner of shares suffered injury from the loss of opportunity to sell them when they were at their highest value).

*           *           *           *

The Amended Complaint states a claim against Empire for negligence.  The Empire Motion must be denied.

**V.**

### THE AMENDED COMPLAINT STATES A CLAIM FOR BREACH OF FIDUCIARY DUTY

Empire states the general rule that corporations do not owe fiduciary duties to shareholders.  Empire Memo at 14.  In certain circumstances, however, a corporation assumes the status of a fiduciary to individual shareholders, and such individuals retain the right to bring a direct (and not derivative) action against a corporation for injuries affecting his legal rights as a shareholder.  *In re Reliance Securities Litigation*, 91 F.Supp.2d 706, 732-33 (D.Del. 2000) (denying Rule 12(b)(6) motion to dismiss the complaint in an action by an individual shareholder alleging breach of fiduciary duty).

Empire's acts and omissions denied Tertiaire/AWF a fair opportunity to prevent the delivery of Tertiaire's Empire Shares to the Delaware Escheator.  Although Delaware courts have yet to consider whether such a situation gives rise to a fiduciary duty, California courts – interpretingan identical provision of its unclaimed property statute (the Unclaimed Property Law or "UPL") – have done so.  Presented with a factual setting strikingly similar to the one here, the court concluded that allegations of breach of fiduciary duty may go forward.

> Third, we agree with the dissenting opinion in *Verizon*.  The dissent concluded "the UPL's immunity provisions cannot reasonably be interpreted to apply to the circumstances here, where plaintiffs allege that [the defendant] breached a fiduciary duty to give them a fair opportunity to prevent the operation of the UPL in the first instance."

26

*Azure Ltd. v. I-Flow Corp.*, 163 Cal.App.4th 303, 77 Cal.Rptr.3d 463, 468 (4th DCA 2008)

(*citing Harris v. Verizon Communications* 141 Cal.App.4th 573, 46 Cal.Rptr.3d 185 (2d DCA

2006) (Mallano, J., dissenting) (brackets in original).

It is immaterial whether the fiduciary duty imposed upon and breached by Empire

resulted from its corporation-shareholder relationship with Tertiaire/AWF, or from its holder-

owner relationship with Tertiaire/AWF. *See* 12 Del. Code § 1198(7) (holder means any person

having possession, custody or control of the property of another person). By its unilateral

actions, Empire took possession, custody and control of Tertiaire's Empire Shares and, without

notice to Tertiaire/AWF, wrongly declared them to be abandoned, and delivered them to the

Delaware Escheator.

The Amended Complaint states a claim for breach of fiduciary duty. The Empire

Motion must be denied.

## VI.

### THE AMENDED COMPLAINT
### STATES A CLAIM FOR CONVERSION

Empire acknowledges that "conversion" under Delaware law is the act of

dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent

with it, and "requires an affirmative, intentional act." Empire Memo at 15-16. Empire argues

that AWF "does not allege any facts that demonstrate Empire intentionally exerted control or

dominion over Tertiaire's Empire shares." *Ibid*. The Amended Complaint, however, does

precisely that.

The Amended Complaint, for example, explains the origin of the corporation-

shareholder relationship between Empire and Tertiaire, a merger between ITI and Empire; that

following the merger Empire issued 30,426 of its shares to Tertiaire to replace 40 shares of ITI

27

owned by Tertiaire prior to the ITI-Empire merger.  Am. Compl. ¶¶ 8-16.  These allegations (which must be accepted as true for purposes of the Empire Motion) make Empire an issuer of intangible ownership interests in a corporation.  As a matter of law, "the issuer of any intangible ownership interest in a corporation … shall be deemed a holder of such property."  12 Del. Code § 1198(7).  Subchapter IV of the Delaware escheatment statute defines "holder" as "any person having *possession, custody or control of the property of another person* …."  *Ibid* (emphasis added).

The Amended Complaint then alleges that "*Empire* – either directly or through AST, its authorized agent – *delivered* to the State of Delaware *as unclaimed (escheated) property* the Empire shares owned by Tertiaire."  Am. Compl. ¶ 17 (emphases added).  As a matter of law, this allegation means Empire exerted dominion and control over the property of Tertiaire, in denial of Tertiaire's rights.  *See* 12 Del. Code § 1201(a)(1).

The Amended Complaint further alleges that Empire committed these acts even though a full five-year period of dormancy had not run against Tertiaire's Empire Shares.  Am. Compl. ¶ 25.  This allegation makes wrongful Empire's exercise of control over Tertiaire's Empire Shares.

All these allegations are incorporated into Count VII of the Amended Complaint.  Am. Compl. ¶ 56.  Count VII, therefore, alleges facts sufficient to sustain a claim for conversion against Empire.  Empire, predictably, tries to hide behind the acts or omissions of its agents, AST and/or ACS, to avoid responsibility for the conversion.  Empire Memo at 16.  Principles of the law of agency, however, *impose* responsibility upon Empire for acts and omissions of its agents.  *Arnold v. Society for Sav. Bancorp*, 678 A.2d 533, 539 (Del. 1996) ("It is certainly true that a

principal is liable for wrongs committed by its agents acting in the course of their agency.")

(citation omitted).

Accordingly, the Amended Complaint states a claim for conversion.  The Empire

Motion must be denied.

## VII.

### THE AMENDED COMPLAINT STATES
### A CLAIM FOR FAILURE TO REGISTER

The Empire Motion indicates that Empire misunderstands Count VIII of the

Amended Complaint.  AWF is *not* claiming that Empire failed to register the 2006 requested

transfer from Tertiaire to AWF.  *See* Empire Memo at 17-18.  Rather, AWF is claiming that

Empire either (a) failed to register at all the replacement certificate sent to Tertiaire in May 2000,

or (b) failed to register that replacement certificate in the name of Tertiaire Development, S.A.,

as directed in the Affidavit of Loss and Indemnity Agreement.  Am. Compl. ¶¶ 1, 8-16, & 60.

The latter claim appears proven already.  Empire concedes that the May 2000

Affidavit of Loss and Indemnity Agreement indicated that "Tertiaire Investissement" was

"presently known as Tertiaire Development, S.A."  Empire Memo at 4-5.  Furthermore, that

Agreement was signed by "H. Debache" as "President of Tertiaire *Development*, S.A."  Maher

Decl., Ex. 1 (emphasis added).  Despite these instructions, it appears Empire never registered the

May 2000 replacement certificate in the name of Tertiaire Development, S.A.  On or about

November 6, 2006, the Delaware Bureau of Unclaimed Property prepared a Claim Form

pertaining to Tertiaire's Empire Shares (and corresponding dividends).  It lists the "Name of

Owner(s) as reported to the department" by Empire as "Investissement Tertiaire."  (A true and

correct copy of the Claim Form is Exhibit _ to the Brooks Declaration.).

The former claim – that Empire never registered the replacement certificate at all – arises from the "coincidence" that it was just about five years from the date of issuance of the *initial* certificate for Tertiaire's Empire Shares to the date of delivery of those shares to the Delaware Escheator.  If Empire never registered the *replacement* certificate, it likewise may never have cancelled the *initial* certificate.

In either case, the "delay in registration" or "failure … to register" the replacement certificate may have caused or contributed to the delivery of Tertiaire's Empire Shares.  If so, the "loss resulting from" the unreasonable delay or failure is Tertiaire's loss of its Empire Shares.  At this point in the litigation, however, prior to the commencement of discovery, it is premature to know the answers to these questions and, hence, premature to dismiss the Amended Complaint.

The Amended Complaint states a claim against for failure to register.  The Empire Motion must be denied.

## VIII.

### THE AMENDED COMPLAINT STATES A CLAIM FOR SPECIFIC PERFORMANCE

Delaware recognizes actions for specific performance of delivery of shares in a corporation.  *See AHS New Mexico Holdings, Inc. v. Healthsource, Inc.*, 2007 WL 431051 at *1 (Del.Ch. Feb. 2, 2007).  Specific performance of delivery of shares "is appropriate in situations where the stock is not available in the market, is unique, *or has unique value to the purchaser*." *Gildor v. Optical Solutions, Inc.*, 2006 WL 1596678, at *10 n.33 (Del.Ch. June 05, 2006).

AWF's claim for specific performance seeks the return of property it once owned, property that was wrongfully taken from it.  Am. Compl. ¶¶ 1, 7-17, 21, 62-65.  *See generally*, *U.S. Dimensions Products, Inc. v. Tassette, Inc.*, 290 A.2d 634, 635 (Del. 1972).  The cases cited

by Empire are inapposite:  they concern the efforts of ***prospective*** purchasers to force the sale of shares pursuant to an agreement.  Empire Memo at 18-19.  As property already owned by Tertiaire/AWF, the Tertiaire Empire Shares not only are unique, they also have unique value.

The Amended Complaint states a claim for specific performance.  The Empire Motion must be denied.

CONCLUSION

For the reasons set forth herein, plaintiff A.W. Financial Services, S.A., respectfully requests that the Empire Motion be denied in all respects.

Dated:  Garden City, New York
        June 30, 2008

_____/s/_____
Jon Schuyler Brooks (JB7218)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, New York 10103
(212) 977-9700 (phone)
(212) 262-5152 (fax)

*Attorney for Plaintiff*
*A.W. Financial Services, Inc.*

31

Table of Contents

Page

Table Of Authorities ................................................................................................... ii

Preliminary Statement ................................................................................................. 1

Statement of Facts ...................................................................................................... 4

Argument ..................................................................................................................... 7

I.      The Rules of Civil Procedure Bar the Empire Motion to Dismiss ................... 7

II.     Choice of Law ................................................................................................. 8

III.    Delaware Law Does Not Bar Any Claim by AWF against Empire ................. 8

        A.      Introduction ......................................................................................... 8

        B.      History of Section 1203 ...................................................................... 9

        C.      Section 1203(b) Applies to this Case ................................................ 13

        D.      Section 1203(b) Requires Good Faith ............................................... 14

        E.      Empire Cannot Satisfy the Section 1203(b) Good Faith Test ........... 14

                1.      "Reasonable Attempt to Comply" with Subchapter IV ........... 14

                        (A)     No Period of Dormancy as to Dividends ..................... 16

                        (B)     No Period of Dormancy as to Communications .......... 17

                        (C)     No Period of Dormancy as to Whereabouts ................ 18

                2.      "Reasonable Basis for Believing Property Abandoned" ......... 21

                3.      "Reasonable Commercial Standards of Practice" .................... 21

IV.     The Amended Complaint  States a Claim for Negligence .............................. 22

V.      The Amended Complaint States a  Claim for Breach of Fiduciary Duty ........ 26

VI.     The Amended Complaint  States a Claim for Conversion ............................... 27

VII.    The Amended Complaint States  a Claim for Failure to Register ................... 29

VIII.   The Amended Complaint States  a Claim for Specific Performance ............... 30

Conclusion ................................................................................................................. 31