Jon Schuyler Brooks (JB7218)
jbrooks@phillipsnizer.com
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, New York 10103-0084
(212) 977-9700
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

A.W. FINANCIAL SERVICES, S.A., as successor        **ECF CASE –Filed Electronically**
in interest to TERTIAIRE INVESTISSEMENT, S.A.

                                        Plaintiff,

                                                   **07-CV-8491 (SHS)(RLE)**

                v.

EMPIRE RESOURCES, INC., AMERICAN STOCK
TRANSFER & TRUST COMPANY, and AFFILIATED
COMPUTER SERVICES, INC.,

                                        Defendants.
-------------------------------------------------------------------------x

### MEMORANDUM OF LAW OF A.W. FINANCIAL, S.A. IN OPPOSITION TO THE MOTION OF DEFENDANTS AMERICAN TRANSFER & TRUST CO. AND AFFILIATED COMPUTER SERVICES, INC. TO DISMISS THE AMENDED COMPLAINT

Plaintiff A.W. Financial Services, S.A. ("AWF"), as successor-in-interest to

Tertiaire Investissement, S.A. ("Tertiaire"), respectfully submits this memorandum in opposition

to the motion of defendants American Transfer & Trust Co. ("AST") and Affiliated Computer

Services, Inc. ("ACS") to Dismiss the Amended Complaint (the "AST-ACS Motion"). From the

first sentence of the Introduction to its supporting memo, the AST-ACS Motion errs. Defendants

American Transfer & Trust Co. and Affiliated Computer Services, Inc.'s Memorandum of Law

in Support of Motion to Dismiss ("AST-ACS Memo") at 1.[1]  It must be denied.

---

[1] The AST-ACS Memo wrongly states the "Amended Complaint was filed three-days after the Court-ordered filing deadline" of April 4, 2008. As required by ECF Rule 18.3, it was filed by hand on April 4, 2008. (Docket No. 28.)

**PRELIMINARY STATEMENT**

AST and ACS join co-defendant Empire Resources, Inc. ("Empire") to claim that no one is responsible for the damages suffered by AWF, even though AST and ACS played a role in denying AWF the fair market value of its investment in and ownership of Empire shares. As the Amended Complaint makes plain, in or about October 2004, even though the statutorily-mandated "period of dormancy" had not run; even though Empire and its agent AST knew how to contact Tertiaire in Paris, France; Empire – acting directly or through its agents AST and/or ACS, and without so much as a telephone call to Tertiaire – unilaterally and wrongly determined as a matter of fact and law that Tertiaire "abandoned" 30,426 shares it owned in Empire ("Tertiaire's Empire Shares"). Empire or AST delivered Tertiaire's Empire Shares to the Delaware Escheator, but not in "good faith" as defined in (and required by) applicable Delaware law. But for actions taken or omissions made by Empire, or by its agents AST and ACS, that erroneous and improper escheatment ***never*** would have happened.

AST and ACS join Empire in a discordant chorus claiming immunity, absolution, or exculpation from liability for the damages flowing directly from their acts or omissions. They weave that tale by misstating applicable law, hoping that neither AWF nor this Court takes note.

Once exposed, it becomes apparent that the AST-ACS Motion must be denied.

1049289.2

**STATEMENT OF FACTS**

This statement of facts is drawn from the Amended Complaint and materials outside the record upon which AWF relied in drafting it. This statement of facts also responds to the statement of facts set forth in the AST-ACS Memo at 2-3.

In January 1994, Tertiaire purchased forty shares of Integrated Technology USA, Inc. ("ITI"). Am. Compl. ¶¶ 1, 7. In connection with the purchase, Tertiaire identified itself to ITI's attorney as "a French Investment Company." *See* January 11, 1994 letter from Hervé Debache, President of Tertiaire, to KS Goodwin of the law firm Coleman Rhine, a true and correct copy of which is Exhibit A to the Declaration of Jon Schuyler Brooks, dated July 9, 2008 ("Brooks Decl."). On January 12, 1994, a copy of that letter was sent directly to ITI. Brooks Decl. Ex. B.

Immediately following Tertiaire's purchase of the ITI shares, ITI's counsel recognized Tertiaire was a French company located in Paris. *See* April 28, 1994 letter from Irving L. Rotter of Sidley & Austin to Tertiaire Investissement, Brooks Decl. Ex. C.

In September 1996, in connection with ITI's proposed initial public offering, ITI sent Tertiaire a Questionnaire Regarding NASD Affiliations. It was sent by facsimile to Tertiaire in Paris, France, to the attention of Herve Debache, with the handwritten instruction that it be signed "in the name of Tertiaire Investissement." It was so signed, and the address given was Paris, France. *See* Brooks Decl. Ex. D.

In September 1999, ITI merged with and into Empire, a Delaware corporation with its principal place of business in New Jersey, with the name of the surviving company being Empire. As a result of the merger, the 40 shares of ITI owned by Tertiaire ultimately became 30,426 shares of Empire. Am. Compl. ¶¶ 8, 9.

3

In or about April 2000, Tertiaire (by then known as Tertiaire Development, S.A.) wrote to Empire inquiring about its shares. In response to that inquiry, on May 4, 2000, Defendant AST wrote to Tertiaire to "acknowledge your recent letter regarding the loss of the above certificates [IT0065], against which we have placed a "STOP TRANSFER" notation on our records." In fact, Tertiaire never had received (and therefore did not lose) certificate IT0065. Am. Compl. ¶¶ 10-12.

Nonetheless, as a condition of providing a replacement certificate AST required Tertiaire to execute an Affidavit of Loss and Indemnity Agreement, and to purchase a surety bond with a premium in the amount of $1,003.84. Tertiaire complied with AST's demands. Am. Compl. ¶¶ 13-14.

In the Affidavit of Loss and Indemnity Agreement dated May 22, 2000, Tertiaire stated explicitly that it was "presently known as Tertiaire Development, S.A.," stated its address as "47 Rue de Chaillot, Paris 75116," and its telephone number as "01 56 62 2100." It was signed by "H. Debache" in his capacity as "President of Tertiaire *Development*, S.A." On or about May 30, 2000, Defendant Empire issued a replacement certificate, number IT0328. Defendant AST sent the replacement certificate to Tertiaire. Am. Compl. ¶¶ 15-16.

On or about October 20, 2004, Empire – either directly or through AST, its authorized agent – delivered to the State of Delaware as unclaimed (escheated) property the Empire shares owned by Tertiaire. In or about February 2005, the State of Delaware (directly or through ACS) sold the Empire shares as follows:

- 5,426 shares at $4.0395/share (February 2, 2005); and

- 25,000 shares at $3.8133/share (February 3, 2005).

Am. Compl. ¶¶ 17-18.

4

On or about March 29, 2006, Tertiaire – by then known as AWF – wrote to Empire requesting that the Empire shares owned by Tertiaire be re-registered in the name of AWF. AWF maintained the same address, telephone, and facsimile numbers as its predecessors-in-interest, Tertiaire and Tertiaire Development. In or about April 2006, through serial conversations and correspondence with Empire, AST and ACS, AWF learned for the first time that the Empire shares owned by Tertiaire had been escheated by Empire to the State of Delaware. Am. Compl. ¶¶ 19-21.

Between February 2005 and March 2006, the market value of the Empire shares rose from approximately $4 per share to $32.61 per share. On May 3, 2006, Empire shares traded at $57.87 per share. Am. Compl. ¶ 22.

**ARGUMENT**

**I.**

**THE FEDERAL RULES OF CIVIL PROCEDURE<br>BAR PORTIONS OF THE AST-ACS MOTION TO DISMISS**

AWF commenced this matter on September 28, 2007.  (Docket No. 1.)  Service of Process was completed on October 10, 2007.  (Docket Nos. 4-6.)  Responsive pleadings were due on October 30, 2007.  Fed. R. Civ. P. 12(a)(1)(A)(i).

Defendant AST, through counsel, requested an extension of time through November 30, 2007, to answer or otherwise move in response to the Complaint.  AWF consented to the request.  (Docket No. 8.)  AST answered the Complaint on November 30, 2007.  (Docket No. 13.)

Defendant ACS, through counsel, requested an extension of time through December 7, 2007, to answer or otherwise move in response to the Complaint.  AWF consented to the request.  (Docket No. 10.)  ACS moved to dismiss the Complaint on December 7, 2007.  (Docket No. 14.)  That motion to dismiss was dismissed without prejudice on March 21, 2008.  (Docket No. 26.)

Defendant AST did not file a Rule 12(b) motion prior to filing an Answer.  It thereby lost its ability to file such a motion.  Fed. R. Civ. P. 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed.").

AWF filed an Amended Complaint on April 4, 2008.  (Docket No. 28.)  "[A]n amendment to the pleadings permits the responding pleader to assert only such of those defenses which may be presented in a motion under Rule 12 as were not available at the time of his response to the initial pleading."  *Ross v. U.S.*, 574 F.Supp. 536, 539 (S.D.N.Y. 1983); *accord*, *Sears Petroleum & Transport Corp. v. Ice Ban America, Inc.*, 217 F.R.D. 305, 307 (N.D.N.Y.

6

2003) (if an "amended complaint also contains new matter, the defendant may bring a second motion under Rule 12 to object to the new allegations only") (citation omitted).

Defendant AST, therefore, may not now bring a Rule 12(b) motion to dismiss except to the extent there are new allegations made against AST in the Amended Complaint. Given the procedural history of this case, Defendant ACS may renew its prior motion to dismiss, but may not expand it except to the extent there are new allegations made against ACS in the Amended Complaint.

**A.    AST's Motion Must be Limited to AWF's Breach of Contract Claim**

As to Defendant AST, the only new allegations in the Amended Complaint are those set forth in Count V:  Breach of Contract.  Am. Compl. ¶¶ 44-48.  Its Rule 12(b) motion, therefore, must be limited to Count V.  *Ross v. U.S.*, 574 F.Supp. at 539.

Accordingly, those portions of the AST-ACS Motion that claim AST enjoys immunity (AST-ACS Memo at 8-13), the Amended Complaint fails to state a claim for negligence against AST (*id*. at 13-15), and the Amended Complaint fails to state a claim for conversion against AST (*id*. at 17-18), are untimely.  As to those portions, the AST-ACS Motion must be denied.

**B.    ACS's Motion May Not Challenge AWF's Conversion Claim**

In its December 7, 2007 motion to dismiss the original Complaint, Defendant ACS did not challenge the sufficiency of Count V:  Conversion.  *See* Memorandum of Law in Support of Defendant Affiliated Computer Service, Inc.'s Motion to Dismiss (Docket No. 14, Attachment No. 1).  Having failed to do so then, it cannot do so now.  As to that portion, the AST-ACS Motion must be denied.

7

## II.

### CHOICE OF LAW

For purposes of the AST-ACS Motion, and except as otherwise stated herein, AWF takes no position as to choice of law.

## III.

### DELAWARE LAW DOES NOT BAR ANY CLAIM BY AWF AGAINST AST

**A.     Introduction**

The AST-ACS Motion states falsely that AWF's suit against AST "seeks damages arising from AST's allegedly wrongful delivery of Plaintiff's Empire shares to the State of Delaware."  AST-ACS Memo at 9.  In fact, ***none*** of AWF's claims seeks to hold AST – or its co-defendants – liable ***for*** the unquestionably wrongful delivery; rather, ***all*** of AWF's claims seek to hold AST and the other defendants liable for their respective predicate acts (or omissions) that ***resulted in*** the premature escheatment and AWF's damages.

AST, however, attempts to recast the nature of AWF's claims in a transparent attempt to avail itself of a statutory bar to recovery provided in some instances by the Delaware escheatment statute.  AST-ACS Memo at 8 (*citing* 12 Del. Code § 1203(a)).  Even if AWF's claims were based solely on the premature escheatment of Tertiaire's Empire Shares, the bar provided by Section 1203(a) would not apply because – as demonstrated conclusively by the history of Section 1203, subsection (a) does not apply to situations such as the one before the Court involving the escheatment of shares in a corporation.  Furthermore, even if Section 1203(a) did apply to such situations, the language of the Delaware escheatment statute makes plain that it does not apply to transfer agents such as AST.

8

**B.      History of Section 1203**

In 1971, Delaware added Subchapter IV, entitled "Other Unclaimed Property," to

its escheat statutes.  58 Del. Laws, c. 275, § 1.  This amendment to Title 12 of the Delaware

Code added sections 1197 through 1202.  Section 1197 explained the subchapter applied to

> [a]ll property, as hereinafter defined, and not otherwise subject to escheat
> in accordance with this chapter, the title to which has failed and the power
> of alienation suspended by reason of , (a) the death of the owner thereof,
> intestate, leaving no known heirs-at-law; (b) the owner thereof having
> disappeared or being missing from his last known place or residence for a
> continuous period of 7 years or more, leaving no known heirs-at-law; or
> (c) the same having been abandoned by the owner thereof, as hereinafter
> defined, shall descend to the State of Delaware in accordance with the
> Constitution, the general laws of this State, or the provisions of this Act.

*Ibid*.

"Property" was defined in Section 1198(b) to include "(3) stocks, bonds and other

securities."  "Abandoned" was not separately defined; "abandoned property," however, was

defined in Section 1198(3) to mean "property against which a full period of dormancy has run."

"Full period of dormancy" was defined in Subsection (f) to mean "the full and continuous period

of 7 years … during which an owner has ceased, failed, or neglected to exercise dominion or

control over his property or to assert a right of ownership or possession; … or to do any other act

in relation to or concerning such property."  58 Del. Laws, c. 275, § 1 (1971).

As adopted in 1971, Subchapter IV did ***not*** include Section 1203 or any other

provision relieving holders from liability.  *See* 58 Del. Laws, c. 275, § 1 (1971).  Within a year of

enacting Subchapter IV, however, the same session of the Delaware legislature amended it to

add, among other things, Section 1203.  58 Del. Laws, c. 426, § 8 (1972).  *Cory v. Tampax Inc.*,

1976 WL 1707 *4 (Del. Chancery Apr. 30, 1976) (Section 1203 was "added by amendment on

June 15, 1972, to the existing [Delaware] escheat statutes").

As adopted in 1972, Section 1203 read:

9

1049289.2

**Relief from liability**

The payment or delivery of property to the State Escheator by any holder shall terminate any legal relationship between the holder and the owner and shall release and discharge such holder from any and all liability to the owner, his heirs, personal representatives, successors and assigns by reason of such delivery or payment, regardless of whether such property is in fact and in law abandoned property and such delivery and payment may be pleaded as a bar to recovery and shall be a conclusive defense in any suit or action brought by such owner, his heirs, personal representatives, successors and assigns or any claimant against the holder by reason of such delivery or payment.

58 Del. Laws, c. 426, § 8 (1972).  At that time, Section 1203 was a provision with **no** subsections whatsoever.

Section 1203 remained unchanged until 1986, when the Delaware legislature overhauled Subchapter IV to address one single issue:  "To Provide for the Escheat to the State of Intangible Ownership Interests in Corporation when Dividends or other Distributions thereon have been Abandoned."  65 Del. Laws, c. 351 (1986).  That overhaul amended five provisions of Subchapter IV:

- it replaced the phrase "stocks, bonds or other securities" in the definition of "property" with "intangible ownership interests in corporations, whether or not represented by a stock certificate" (65 Del. Laws, c. 351, § 3 (1986));

- it redefined "holder" to include "the issuer of any intangible ownership interest in a corporation," but that expansion did not extend to transfer agents (65 Del. Laws, c. 351, § 1 (1986));

- it established a separate, three-part definition of "full period of dormancy" applicable only to intangible ownership interests in a corporation  (65 Del. Laws, c. 351, § 2 (1986));

10

1049289.2

- it restricted holders of intangible ownership interests in a corporation from delivering such interests unless each part of the "full period of dormancy" definition was satisfied and, in the case of certificated securities, further required such holders to deliver *either* the original stock certificate if in their possession *or* a duplicate of it  (65 Del. Laws, c. 351, § 4) (1986)); and

- it limited the ability of holders of intangible ownership interests in a corporation who do not possess the *original* stock certificate to invoke the Section 1203 "relief from liability" by imposing upon them the burden of delivering the duplicate certificate in "good faith," a phrase it defined through a three-part test (65 Del. Laws, c. 351, § 5 (1986)).

This comprehensive, integrated approach to the escheatment of intangible ownership interests in a corporation – such as AWF's ownership interest in 30,426 Empire shares – remains materially unchanged two decades later, and applies to this case.  *Compare*  65 Del. Laws, c. 351, §§ 1-5 (1986) *with* 12 Del. Code §§ 1198(7), 1198(9)a.1-3; 1198(11)(iii), 1201(a)(1), & 1203(b)-(d).[2]

The 1986 amendments fundamentally altered Section 1203:  the text of pre-1986 Section 1203 was designated subsection (a), and new subsections (b), (c) and (d) were added.

(b) Upon the delivery *in good faith* of a duplicate certificated security to the State Escheator or the registration of an uncertificated security to the

---

[2] The 1986 amendments were taken, almost verbatim, from the Uniform Unclaimed Property Act (1981) ("UUPA(1981)").  *See*  UUPA(1981) §§ 1(10)(iii), 10, 19(d), 20(e) & 20(f)(1)-(3).  As explained by the drafters:

> The 1966 Act provided a presumption of abandonment of unclaimed dividend or interest checks but arguably did not cover the underlying ownership interest represented by issued and outstanding securities certificates. In recent years several states have amended their statutes to authorize taking of this property and indications are that the trend is likely to continue. California, Florida, Indiana, Maine, Massachusetts, Montana, Rhode Island and Virginia have statutes with such provisions and other states are known to be considering similar proposals. *The new Act specifically covers securities even though they are not in the possession of the issuer*. See Section 10.

UUPA(1981) at 7 (emphasis added).

State Escheator pursuant to § 1201 hereof, the holder and any transfer agent, registrar or other person acting for or on behalf of the holder in executing or delivering such duplicate certificate or effectuating such registration, is relieved of all liability of every kind to every person, including any person acquiring the original of a certificated security or the duplicate of a certificated security issued to the State Escheator, for any losses or damages resulting to any person by issuance and delivery to the State Escheator of the duplicate certificated security or the registration to the his name of an uncertificated security.

(c) If the holder pays or delivers property to the State Escheator in good faith and thereafter another person claims the property from the holder or another state claims the money or property under its laws relating to escheat or abandoned or unclaimed property, the State Escheator acting on behalf of the State, upon written notice of the claim, shall defend the holder against the claim and indemnify the holder against any liability on the claim.

(d) For the purposes of this section, "good faith" means that:

(1) Payment or delivery was made in a reasonable attempt to comply with this Act;

(2) The person delivering the property was not a fiduciary then in breach of trust in respect to the property and had a reasonable basis for believing, based on the facts then known to him, that the property was abandoned for the purposes of this subchapter; *and*

(3) There is no showing that the records pursuant to which the delivery was made did not meet reasonable commercial standards of practice in the industry.

65 Del. Laws, c. 351, § 5 (1986) (emphases added).

This history demonstrates that Section 1203(a) does *not* apply to the facts of this case in which the property improperly escheated to the State was an intangible ownership interest in a corporation:  Tertiaire's Empire Shares.

The history of Section 1203, however, is not the only basis for reaching this conclusion.  Another is the language of Section 1203.  Whereas Section 1203(a) appears to provide holders of other types of property with a "bar to recovery" and "a conclusive defense,"

12

Section 1203(c) offers holders of intangible ownership interests in a corporation only the protection of the State's duty to defend against the claims of others and indemnify for any liability.  *Compare* 12 Del. Code § 1203(a) *with* 12 Del. Code § 1203(c).  Obviously, if the Section 1203(a) "bar to recovery" and "conclusive defense" applied to matters such as this one involving the escheatment of shares, holders of such shares never would be exposed to any potential liability and there would be nothing for the State to indemnify, even theoretically.  Such an interpretation of Section 1203(a) would negate the express language of Section 1203(c), and that possibility is precluded by general rules of statutory construction.

Furthermore, even if Section 1203(a) did apply, AST could not invoke it.  As AST concedes, Section 1203(a) applies to the "holder" of certain unclaimed property.  AST-ACS Memo at 9; 12 Del. Code § 1203(a).  In an attempt to bring itself within the umbrella of Section 1203(a), AST understandably, but mistakenly – and without citing any authority in its support – declares itself to be a "holder."  *Ibid*.  Where, as here, the property at issue is shares in a corporation, and the owner is in actual physical possession of those shares, AST is not and cannot be deemed a holder.

> ***"Holder" means any person having possession, custody or control of the property of another person*** and includes a post office, a depository, a bailee, a trustee, a receiver or other liquidating officer, a fiduciary, a governmental department, institution or agency, a municipal corporation and the fiscal officers thereof, a public utility, service corporation and every other legal entity incorporated or created under the laws of this State or doing business in this State. For purposes of this subchapter, ***the issuer of any intangible ownership interest in a corporation***, whether or not represented by a stock certificate, which is registered on stock transfer or other like books of the issuer or its agent, ***shall be deemed a holder of such property***.

12 Del. Code § 1198(7) (emphases added).

AST is not a holder because it did not have possession, custody or control of Tertiaire's Empire Shares. As AST admits, those shares, represented by the original replacement certificate IT0328, were in AWF's possession, custody and control. AST-ACS Memo at 11; *see also* Am. Compl. ¶¶ 16, 19.

AST cannot be deemed a holder because the 1986 amendments to the Delaware escheatment statute limited the expansion of the definition of "holder" to include "the issuer of any intangible ownership interest in a corporation"; they did ***not*** expand it to include the transfer agent who acts for the issuer. Indeed, those 1986 amendments demonstrate the intent of the Delaware legislature to ***exclude*** transfer agents from the definition of holder by differentiating between the two:

> Upon the delivery in good faith of a duplicate certificated security to the State Escheator or the registration of an uncertificated security to the State Escheator pursuant to § 1201 of this title, ***the holder and any transfer agent***, registrar or other person acting for or on behalf of the holder in executing or delivering such duplicate certificate or effectuating such registration, is relieved of all liability of every kind to every person

12 Del. Code § 1203(b). If transfer agents were included in the definition of "holder," the addition of the phrase "***and any transfer agent***" would be unnecessary and meaningless.

## C.    Section 1203(b) Applies to this Case

To the extent, if any, that Section 1203 applies here, the appropriate provision is not subsection (a), but subsection (b). Indeed, AST concedes that because Tertiaire's Empire Shares were in AWF's physical possession, "the only reasonable inference is that the delivery of Plaintiff's Empire shares to the State of Delaware was accomplished by delivery of a duplicate certificated security. ***Section 1203(b), therefore, applies to AST's delivery*** of Plaintiff's Empire shares to the State of Delaware." AST-ACS Memo at 11 (citation omitted; emphasis added).

14

In the absence of an interpretation of Section 1203(b) by Delaware courts, AST relies heavily upon a California decision interpreting "nearly identical provisions of that state's escheatment law" (the Unclaimed Property Law or "UPL") for the proposition that, upon the delivery of abandoned shares to the State, a corporation and its transfer agent are immune from an owner's suit for damages and other liabilities. AST-ACS Memo at 11-12 (*citing Harris v. Verizon Communications*, 46 Cal. Rptr.3d 185, 188-89 (Cal. Ct. App. 2nd Dist. 2006)).

Less than four weeks after AST filed the AST-ACS Motion, however, *Verizon* was eviscerated by a unanimous panel of another district of the California Court of Appeals. *Azure Ltd. v. I-Flow Corp.*, 77 Cal.Rptr.3d 463 (Cal. Ct. App. 4th Dist. 2008). If *Verizon* ever provided analogous precedent for use by this Court, it no longer does.

The *Azure* Court held that immunity attaches to a corporation (and, presumably, its transfer agent) "*only* if plaintiff's shares 'escheat[ed] to th[e] state' – i.e., only if plaintiff failed to claim dividends or communicate for three years *and* defendant did not know its location." *Azure*, 77 Cal.Rptr.3d at 467 (emphases and brackets in original).

Furthermore, the *Azure* Court adopted the analysis of the dissenting opinion in *Verizon* to hold also that the "nearly identical provisions" of California's escheatment law provide "no immunity for wrongful acts predating the transfer of the shares to the state." *Id*. at 468. The plaintiff in *Azure* sought relief for damages caused by acts and omissions that occurred prior to "the issuance and delivery of the duplicate [stock] certificate." *Id*. (*citing Verizon*, 141 Cal.App.4th at 585, 46 Cal.Rptr.3d 185 (Mallano, J., dissenting) (brackets in original)).

The *Azure* decision is directly on point. In that case, as here, Plaintiff alleged that its shares were escheated even though the conditions precedent for a full period of dormancy had not run against its shares. Consequently, neither Empire nor AST enjoy immunity.

**D.      Section 1203(b) Requires Good Faith**

AST concedes that, unlike the California escheatment statute, Section 1203(b) imposes on its face an absolute requirement that delivery of the duplicate stock certificate to the Delaware Escheator be made in good faith.  "The Delaware statute conferring immunity upon transfer agents … contains a requirement that ***shares must have been delivered to the State in good faith***."  AST-ACS Memo at 12 (*citing* 12 Del. Code § 1203(b)) (emphasis added).  This requirement appears in the UUPA(1981) from which Sections 1203(b)-(d) were drawn.  UUPA(1981) §§ 19(d), 20(e), & 20(f).  "When property is turned over to the state, the holder is relieved of all liability for any turnover ***made in good faith***."  UUPA(1981) § 20 Comment (emphasis added).

AST mistakenly states the "Amended Complaint does not allege that AST did not act in good faith, as defined by the Delaware statutes, when delivering the shares to the State."  AST-ACS Memo at 13.  The Amended Complaint does just that when it alleges that Tertiaire's Empire Shares were delivered to the Delaware Escheator before the full five-year period of dormancy had run.  Am. Compl. ¶¶ 16, 17, 23-25, 29-30, 44 & 56; *see* 12 Del. Code § 1203(d).[3]  Furthermore, as acknowledged by AST's co-defendant, AWF always has taken the position that the delivery of Tertiaire's Empire shares to the Delaware Escheator was required to, but did not, satisfy the Section 1203(d) good faith test.  *See* Memorandum in Support of Defendant Empire Resources, Inc.'s Motion to Dismiss the Amended Complaint at 10 (plaintiff asserted in Court that the "good faith" requirement set forth in Section 1203(b) applied to this case).

Apparently relying on its misplaced belief that AWF has not alleged that AST failed to delivery Tertiaire's Empire Shares in "good faith," the AST-ACS motion makes no

---

[3] To the extent, if any, this Court determines that the Amended Complaint does not so allege with sufficient clarity, AWF respectfully requests and reserves it right to seek leave to make the amendments necessary to do so.

attempt to demonstrate that AST satisfied any – let alone all – of the elements of the three-prong "good faith" test set forth in Section 1203(d). *See generally*, AST-ACS Memo at 12-13; *see also* 12 Del. Code § 1203(d).

**E.    AST Cannot Satisfy the Section 1203(b) Good Faith Test**

    **1.    "Reasonable Attempt to Comply" with Subchapter IV**

        The first element of the good faith test requires the holder (Empire) or transfer agent (AST) to demonstrate that the delivery of Tertiaire's Empire Shares to the Delaware Escheator "was made in a reasonable attempt to comply" with the provisions of Subchapter IV. 12 Del. Code § 1203(d)(1).  AST cannot so demonstrate.

        Intangible ownership interests in a Delaware corporation may be delivered to the State Escheator *only* as, when, and if they are deemed abandoned under Subchapter IV.

>     (a) On or before the date required for the filing of the report pursuant to § 1199 of this title, every holder of abandoned property shall pay or deliver to the State Escheator all abandoned property specified in the report ….  The holder of any intangible ownership interest in a corporation *deemed abandoned under this subchapter* shall, when making the delivery contemplated by this section:
>     (1) If such interest is a certificated security as defined in § 8-102(a) of Title 6 deliver either the original stock certificate *evidencing the abandoned property*, if such is in its possession or a duly issued replacement certificate evidencing such property in a form suitable for transfer.

12 Del. Code § 1201(a)(1) (emphases added).  Property is abandoned *only* as, when, and if a "full period of dormancy has run."  12 Del. Code § 1198(1).  Delaware law provides that,

> with respect to an intangible ownership interest in a corporation, whether or not represented by a stock certificate, *the period of dormancy means a period of 5 years* during which:
>
>     1. The owner has not claimed a dividend, distribution or other sum with respect to such interest;
>
>     2. *The owner has not communicated in writing with the holder concerning such property* or otherwise communicated with the holder

17

concerning such property which communication is evidenced by a writing or other record prepared by the holder or its employee in the ordinary course of business; *and*

3. At the end of which *the holder does not know the current location* of the owner of such property.

12 Del. Code § 1198(9)a. (emphases added). Each of these three conditions must be met. None of them had been – and none of them could have been – met at the time AST delivered Tertiaire's Empire Shares to the Delaware Escheator.

### (A)    No Period of Dormancy as to Dividends

The first condition is that an owner has not claimed a dividend in five years. 12 Del. Code § 1198(9)a.1. This condition is taken from Section 10(a) of the UUPA(1981).[4] The drafters of the UUPA(1981) explained the purpose of this condition.

> The existing underlying shares statutes make no formal distinction between dividend and nondividend paying stock and provide that the mere passage of time with no contact is sufficient to raise the presumption of abandonment. Section 10 combines both a period of inactivity, 7 years, with the requirement that distributions paid on the underlying intangible interest remain unclaimed, thus avoiding concerns that *abandonment should not be presumed where a shareholder has not contacted a non-dividend paying company*.

---

[4] Section 10(a) provides:

> [S]tock or other intangible ownership interest in a business association, the existence of which is evidenced by records available to the association, is presumed abandoned and, with respect to the interest, the association is the holder, if a dividend, distribution, or other sum payable as a result of the interest has remained unclaimed by the owner for 7 years and the owner within 7 years has not:
> (1) communicated in writing with the association regarding the interest or a dividend, distribution, or other sum payable as a result of the interest; or
> (2) otherwise communicated with the association regarding the interest or a dividend, distribution, or other sum payable as a result of the interest, as evidenced by a memorandum or other record on file with the association prepared by an employee of the association.

UUPA(1981) § 10(a). Delaware originally adopted the seven-year standard, but amended it to five years in 1988. *Compare* 65 Del. Laws, c. 351, § 2 (1986) *with* 66 Del. Laws, c. 379, § 3 (1988).

UUPA(1981) § 10, Comment.  In other words, the five-year period of dormancy starts to run *only* when an owner fails to claim a declared and distributed dividend.

Empire first declared a dividend on June 19, 2003.[5]  Consequently, the five-year "period of dormancy" did not expire until June 18, 2008.

As a matter of fact, AST can neither claim nor demonstrate that, as of the time it delivered Tertiaire's Empire Shares to the Delaware Escheator in October 2004, a period of five years had run during which Tertiaire failed to claim dividends.  Upon these facts, as a matter of law, AST is unable to satisfy this first condition; its inability to do so means a full period of dormancy had *not* run against Tertiaire's Empire Shares at the time AST delivered them to the Delaware Escheator.  12 Del. Code § 1198(9)a.1.

In the absence of a full period of dormancy, Tertiaire's Empire Shares cannot be deemed abandoned.  12 Del. Code § 1198(1).  Their delivery to the Delaware Escheator in October 2004, therefore, violated the most basic provisions (and protections) of Subchapter IV.  Accordingly, their delivery was not made in a reasonable attempt to comply with the requirements of Subchapter IV.  12 Del. Code §§ 1201(a)(1), 1203(d)(1).

### (B)    No Period of Dormancy as to Communications

Even assuming *arguendo* that AST could satisfy the first condition, it cannot satisfy the second one:  the owner (Tertiaire) has not communicated in writing with the holder concerning such property for a continuous period of five years.  12 Del. Code § 1198(9)a.2.  This condition is taken from Section 10(a)(1) and Section 10(a)(2) of the UUPA(1981).[6]  The

---

[5] In 2002, Empire stated, "The Company has never paid any dividends on its common stock and expects for the foreseeable future to retain all of its earnings from operations for use in expanding and developing its business." Empire Resources, Inc. 2002 Annual Report on Form 10-K at p.6, *available at*  http://sec.gov/Archives/edgar/data/ 1019272/000095011703001235/a34874.txt.  In 2003, Empire stated, "On June 19, 2003 the Board of Directors of the Company declared its first ever dividend on its common stock."  Empire Resources, Inc. 2003 Annual Report on Form 10-K at p.10 http://sec.gov/Archives/edgar/data/1019272/000095011704001197/a37377.txt
[6] For the text of these subsections, see footnote 4 *supra*.

Comment to Section 10 of the UUPA(1981) makes plain that communications with the holder's

transfer agent constitute communications with the holder.

> Additionally, the presumption of abandonment will not arise in the event the missing owner has communicated with the association. In this regard, the communication would normally be with an agent of the association **such as a transfer agent** or a dividend disbursing agent. Of course, **such communication would satisfy the provision of this section**.

UUPA(1981) § 10, Comment (emphases added).

Tertiaire exchanged correspondence with both Empire and AST regarding

Tertiaire's Empire Shares in April and May, 2000, culminating in AST sending Tertiaire a

replacement stock certificate (No. IT 0328) on May 30, 2000.  Am. Compl. ¶¶ 16-17.  By

operation of these facts, a full period of dormancy could not have run against Tertiaire's Empire

Shares prior to May 31, 2005.  12 Del. Code § 1198(9)a.2.

> Additionally, if at any time during the seven year period the owner communicates in writing with the company regarding the ownership interest, for example, by signing a proxy, or, if there is an oral communication between the issuer and the owner, **the abandonment period will start again**. This combination, requiring a period of inactivity together with other evidence of failure to exercise ownership rights, was **intended to minimize holder concerns that these provisions would prematurely take potentially appreciating property from shareholders**.

Epstein, David J., UNCLAIMED PROPERTY LAW AND REPORT FORMS, § 6.06[2](emphases added).[7]

Tertiaire's Empire Shares, therefore, as a matter of law could not be deemed

abandoned at anytime prior to May 31, 2005.  12 Del. Code § 1198(1).  Their delivery by AST to

the Delaware Escheator in October 2004 violated the most basic provisions (and protections) of

Subchapter IV.  Accordingly, their delivery was not made in a reasonable attempt to comply with

Subchapter IV.  12 Del. Code §§ 1201(a)(1), 1203(d)1.

---

[7] Mr. Epstein is "Special Consultant" to AST's co-defendant ACS.  *See* http://www.nappco-ny.com/Epstein.htm.

20

**(C)**    **No Period of Dormancy as to Whereabouts**

Even assuming *arguendo* that Empire could satisfy the first and second conditions and demonstrate in fact and law that a full five-year period of dormancy had run prior to the delivery of Tertiaire's Empire Shares to the Delaware Escheator in October 2004, it nonetheless cannot satisfy the third one:  at the end of the five-year period, the holder does not know the current location of the owner.  12 Del. Code § 1198(9)a.3.

AST, no doubt, will argue disingenuously that, according to its share registry, Tertiaire's last known address was in Israel, that dividend checks sent to that address beginning in 2003 had been returned to Empire, and that it would have been futile to send notice to a "bad" address.  Even if such an argument were predicated upon accurate facts, it would be invalid here because, unlike other sections of Subchapter IV, Section 1198(9)a.3. does not use "last known address … appearing from the records of the holder" as the standard to define, delimit and determine the holder's knowledge of the owner's whereabouts.  *See* 12 Del. Code § 1199(a)(1).  Instead, it requires a holder to prove affirmatively that "the holder ***does not know the current location*** of the owner of the property."  12 Del. Code § 1198(9)a.3.  Empire's "knowledge" of that location derives not only from an entry in its stock ledger, but also from the collective knowledge of its officers and agents. *See*, *e.g.*, *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1062 n.83 (Del.Ch. 2004) (*citing* 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 790-91, at 14-18 (perm. ed., rev. vol. 2002) (stating the general rule that "a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation")).

21

AST knew the "current location" of Tertiaire since at least May 2000.  AST concedes that since that time it had in its possession, custody or control an "Affidavit of Loss and Indemnity Agreement" executed at its request by Tertiaire.  AST-ACS Memo at 2-3.  *See also*, Declaration of Deborah A. Maher in Support of Defendant Empire Resources, Inc.'s Motion to Dismiss the Amended Complaint, dated May 2, 2008 ("Maher Decl."), Ex. 1.  AST concedes further that this document "stated that Tertiaire was 'presently known as Tertiaire Development, S.A.,' stated its address as '47 Rue de Chaillot, Paris 75116,' and its telephone number as '01 56 62 2100.'"  AST-ACS Memo at 2-3 (*citing* Am. Compl. ¶ 15); *see also* Maher Decl., Ex. 1.

No later than May 2000, from the correspondence leading up to the Affidavit of Loss and Indemnity Agreement, AST knew that the initial Empire stock certificate issued to Tertiaire – which Empire/AST apparently sent to Israel – never reached Tertiaire.  AST therefore knew or should have known that the address in Israel was a "bad" address.  Furthermore, as of May 2000, AST knew that Tertiaire had a "good" address in France, and that the address in France was different from and more current than Tertiaire's "prior address" in Israel.  Since May 2000, and through the present day, Tertiaire and its successor-in-interest, AWF, retained that same address and telephone number in France.  Am. Compl. ¶ 20.

In 2004, AST knew Tertiaire's "current location."  (Despite that knowledge, AST made no attempt to provide the requisite notice to Tertiaire at its current location.)  A full five-year period of dormancy could not have run against Tertiaire's Empire Shares at any time subsequent to May 2000, so long as Tertiaire or its successor-in-interest, AWF, remained at the location in Paris disclosed to Empire at that time.  12 Del. Code § 1198(9)a.3.  Tertiaire's Empire Shares, therefore, as a matter of law, could not be deemed abandoned.  12 Del. Code § 1198(1).  Their delivery by AST to the Delaware Escheator in October 2004 violated the most basic

22

provisions (and protections) of Subchapter IV.  Accordingly, their delivery was not made in a reasonable attempt to comply with Subchapter IV.  12 Del. Code §§ 1201(a)(1), 1203(d)1.

*                    *                    *                    *

AST cannot satisfy all three conditions precedent imposed by Delaware law to a determination that a full five-year period of dormancy had run against Tertiaire's Empire Shares as of the time AST delivered them to the Delaware Escheator.  Consequently, AST cannot prove that their delivery was made in a reasonable attempt to comply with Subchapter IV.  12 Del. Code §§  1201(a)(1); 1203(d)(1).  AST's inability to do so means the delivery was not made in good faith.  12 Del. Code §§ 1203(b), 1203(d)(1).  Accordingly, Section 1203(b) does not provide any immunity, indemnity or other relief to AST, and does not bar any of AWF's claims.

### 2.    "Reasonable Basis for Believing Property Abandoned"

The second element of the good faith test requires the holder (Empire) or its transfer agent (AST) to demonstrate that, at the time it delivered Tertiaire's Empire Shares to the Delaware Escheator, it was not a fiduciary then in breach of trust in respect to the property, and had a reasonable basis for believing, based on the facts then known to it, that the property was abandoned for the purposes of  Subchapter IV.  12 Del. Code § 1203(d)(2).  AST cannot so demonstrate.

Regardless whether AST was a fiduciary, it cannot satisfy this element because it had no reasonable basis to believe the Tertiaire Empire Shares were abandoned as determined by Subchapter IV.  AST's own records demonstrate that, in May 2000, it sent the replacement certificate for Tertiaire's Empire Shares to Tertiaire in Paris, France.  As discussed above, these facts make it impossible that the full five-year period of dormancy had run against Tertiaire's Empire Shares at the time AST delivered them to the Delaware Escheator.  Absent a full period

23

of dormancy, Empire had no reasonable basis to believe Tertiaire's Empire Shares were abandoned for purposes of Subchapter IV.

AST's lack of a reasonable basis means the delivery of Tertiaire's Empire Shares to the Delaware Escheator was not made in good faith. 12 Del. Code §§ 1203(b), 1203(d)(2). Accordingly, Section 1203(b) does not provide any immunity, indemnity or other relief to AST, and does not bar any of AWF's claims.

**3.    "Reasonable Commercial Standards of Practice"**

The third element of the good faith test requires the holder (Empire) or its transfer agent (AST) to demonstrate that the records pursuant to which the delivery was made met reasonable commercial standards of practice in the industry. 12 Del. Code § 1203(d)(3). Although discovery has yet to commence, AWF believes that AST cannot so demonstrate.

AST's records failed so miserably to conform to the reasonable commercial standards of the industry that, in reliance upon them, AST determined wrongly that a full five-year period of dormancy had run against Tertiaire's Empire Shares, and concluded erroneously that Tertiaire was in Israel rather than France.

> Dividend disbursing agents are well advised to consider whether ***the good-faith provision requires that they attempt to ascertain a new address of the shareholder*** in the event that a dividend check is returned as undeliverable. This issue is important because the triggering device which leads to a presumption of abandonment for stock under Section 10 is the existence of uncashed dividend checks. If seven consecutive dividend checks are uncashed and the requisite time period, seven years, has run with no other owner contact, the outstanding stock which generated the dividends is presumed abandoned. Since the agent of the business association knows that dividend checks have been returned, the question arises whether "reasonable commercial standards of practice" require an attempt to correct the issuer's records, that is, to find a proper address. If so, and ***if the records pursuant to which the delivery of the property was made did not meet reasonable commercial standards of practice, then the ultimate turnover of duplicate certificates may not be a good-faith delivery***.

24

Epstein, UNCLAIMED PROPERTY LAW, § 12.20[2][c](emphases added).  In this instance, nothing

was required of AST but to check its own records to find a correct, current location for Tertiaire.

> If the business association has in its records ***an address*** of the owner and
> the value of the stock is $50 or more, the company is required to send
> written notice to the owner in an effort to reunite the owner with the
> property.

*Id*. at § 6.06[3][a](emphasis added).  Apparently, and regrettably, AST failed to do so until the

commencement of this lawsuit, at which time it miraculously re-discovered the Affidavit of Loss

and Indemnity Agreement which provides not only "an address," but also a current telephone

number for Tertiaire/AWF.  Maher Decl., Ex. 1.

This failure means the delivery of Tertiaire's Empire Shares to the Delaware

Escheator was not made in good faith.  12 Del. Code §§ 1203(b), 1203(d)(3).  Accordingly,

Section 1203(b) does not provide any immunity, indemnity or other relief to AST, and does not

bar any of AWF's claims.

## IV.

### THE AMENDED COMPLAINT STATES A CLAIM FOR NEGLIGENCE AGAINST AST

AST makes only one argument in its challenge to the sufficiency of Count II of

the Amended Complaint:  "the Amended Complaint has not adequately pled that AST owes a

legally cognizable duty to Plaintiff – a necessary element of a cause of action for negligence."

AST-ACS Memo at 15.  AST's factual statement is wrong.

The Amended Complaint alleges that Tertiaire was a shareholder of Empire, and

that Empire engaged AST to serve as its authorized transfer agent.  Am. Compl. ¶¶ 1-3, 7-9 &

29-31.  In the common law era, pre-Uniform Commercial Code, such allegations may not have

established a relationship between transfer agents and shareholders that gave rise to any duty.

The adoption of the UCC, however, abrogated the common law in this arena.  *Kenner v. Canal*

25

*Nat. Bank*, 489 F.2d 482, 485 n.3 (1st Cir. 1973) ("the UCC is clear in its intent to abrogate the common law immunity of transfer agents in suits brought by wrongfully injured shareholders").

Delaware adopted the relevant provisions of the UCC.  *See generally* 6 Del. Code § 8-401 *et seq*.  Under the UCC, the aforementioned allegations establish that AST, as transfer agent, "owes a legally cognizable duty to Plaintiff."  6 Del. Code §§ 8-401, 8-407.

> A person acting as authenticating trustee, ***transfer agent***, registrar, or other agent for an issuer in the registration of a transfer of its securities, in the issue of new security certificates or uncertificated securities, or in the cancellation of surrendered security certificates ***has the same obligation to the holder or owner of a certificated or uncertificated security with regard to the particular functions performed as the issuer has in regard to those functions***.

6 Del. Code § 8-407 (emphases added).  *Cohen v. Bankers Trust Co.*, 445 F.Supp. 794, 796 (S.D.N.Y. 1978) (Article 8 of the UCC applies to suit brought by shareholder of Delaware corporation against corporation's New York transfer agent) (interpreting Article 8 of the UCC as adopted by Delaware and New York, and deeming them to be "consistent … with respect to the issues raised herein, … obviat[ing] any question of conflicts of laws").  "By operation of [Section 8-407], a coextensive duty [with that of the issuer] is imposed upon the transfer agent …."  *Kenner*, 489 F.2d at 485; *accord*, *Faro v. Corporate Stock Transfer, Inc.*, 883 So.2d 896, 898 (Fla. 3d DCA 2004).[8]

The UCC, however, is not the only source for the "legally cognizable duty" owed by AST to Tertiaire/AWF.  Another source is the Delaware escheatment statute itself.  Section 1203(b), for example, acknowledges the commercial reality that a transfer agent likely will act for the issuer "in executing or delivering [the] duplicate certificate" to the Delaware Escheator,

---

[8] To understand fully the "coextensive duty imposed upon the transfer agent," it is necessary to understand first the duty imposed upon the issuer by Section 8-401.  An issuer's duty is not limited to the items enumerated in Section 8-401.  "[I]t is reasonable to construe the term 'register the transfer', as used in § 8-401 of the UCC, to include those ministerial acts that normally accompany such registration, including, where applicable, the issuance of a new certificate."  *Bender v. Memory Metals, Inc.*, 514 A.2d 1109, 1115 (Del.Ch. 1986).

26

and therefore relieves the transfer agent "of all liability of every kind to every person" *if* the delivery is made in good faith. 12 Del. Code § 1203(b). At minimum, this language imposes upon AST the duty to act in good faith (as defined by Section 1203(d)) to the extent it was involved in executing or delivering a duplicate certificate of Tertiaire's Empire Shares to the Delaware Escheator. As previously discussed, "good faith" requires satisfaction of three pre-conditions. 12 Del. Code § 1203(d)(1)-(3). AST, therefore, had a duty to Tertiaire/AWF to satisfy each one prior to executing or delivering a duplicate certificate.

Finally, the inclusion of transfer agents in Section 1203(b)'s relief from liability provision gives rise to the inference that transfer agents owe shareholders a duty, the breach of which would expose transfer agents to liability but for the statutorily-provided relief. 12 Del. Code § 1203(b).

The Amended Complaint states a claim for negligence against AST. As to this issue, the AST-ACS Motion must be denied.

## V.

### THE AMENDED COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT AGAINST AST

Contracts between corporations and transfer agents usually include a list of duties to be performed by the transfer agent. *See*, *e.g.*, *Ohrstrom v. Harris Trust Co.*, 1998 WL 8849 at *1 n.1 (Del. Ch. 1998). At this juncture in the litigation, prior to the commencement of discovery, it is impossible to know the duties assumed by AST in its contract with Empire. (Similarly, it is impossible to know whether that contract is governed by Delaware or New York law.) In the event and to the extent the duties assumed by AST include (a) identifying "lost" shareholders, (b) finding "lost" shareholders, (c) determining whether "intangible ownership interests in a corporation" are "abandoned" under Delaware law, or (d) executing and delivering

27

"duplicate certificates" to the Delaware Escheator, Tertiaire/AWF is not only an incidental beneficiary of that contract, but the primary beneficiary.

The Amended Complaint states a claim, at this point in the litigation, for breach of contract against AST.  As to this issue, the AST-ACS Motion must be denied.

## VI.

### THE AMENDED COMPLAINT STATES A CLAIM FOR CONVERSION AGAINST AST

AST acknowledges that "conversion" under Delaware law is the act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it, and that "shares are converted by any act or control or dominion without the stockholder's authority or consent, and in disregard, violation, or denial or his rights as a stockholder of the company." AST-ACS Memo at 17 (citation omitted).  The Amended Complaint alleges that AST did precisely that.

The Amended Complaint, for example, explains the origin of the corporation-shareholder relationship between Empire and Tertiaire, a merger between ITI and Empire; that following the merger Empire issued 30,426 of its shares to Tertiaire to replace 40 shares of ITI owned by Tertiaire prior to the ITI-Empire merger.  Am. Compl. ¶¶ 8-16.  These allegations (which must be accepted as true for purposes of the AST-ACS Motion) make Empire an issuer of intangible ownership interests in a corporation.  As a matter of law, "the issuer of any intangible ownership interest in a corporation … shall be deemed a holder of such property."  12 Del. Code § 1198(7).  Subchapter IV of the Delaware escheatment statute defines "holder" as "any person having ***possession, custody or control of the property of another person*** …."  *Ibid* (emphasis added).

28

The Amended Complaint then alleges that "Empire – *either directly or through AST*, its authorized agent – *delivered* to the State of Delaware *as unclaimed (escheated) property* the Empire shares owned by Tertiaire." Am. Compl. ¶ 17 (emphases added). As a matter of law, this allegation means AST exerted dominion and control over the property of Tertiaire, in denial of Tertiaire's rights. *See* 12 Del. Code § 1201(a)(1).

The Amended Complaint further alleges that AST committed these acts even though a full five-year period of dormancy had not run against Tertiaire's Empire Shares. Am. Compl. ¶ 25. This allegation makes wrongful AST's exercise of control over Tertiaire's Empire Shares.

All these allegations are incorporated into Count VII of the Amended Complaint. Am. Compl. ¶ 56. Count VII, therefore, alleges facts sufficient to sustain a claim for conversion against AST. *See generally*, 6 Del. Code § 8-407.

Accordingly, the Amended Complaint states a claim for conversion against AST. As to this issue, the AST-ACS Motion must be denied.

## VII.

### SOVEREIGN IMMUNITY DOES NOT BAR <u>ANY</u> CLAIM BY AWF AGAINST ACS

ACS argues that it "is immune from suit for [AWF's] state law claims under the doctrine of sovereign immunity." AST-ACS Memo at 18. This argument suffers from four fatal flaws.

First, ACS – notwithstanding the potential for conflicts of interest – wore two hats in the transactions at issue: one resulting from its contract with AST to review corporate records for "abandoned" property; the other resulting from its contract with the State of Delaware to review reports of "abandoned" property submitted by corporations. It is beyond dispute that, if

ACS enjoys sovereign immunity, it does **not** do so in the former role. Accordingly, the claims against ACS arising from or relating to its relationship with AST cannot be barred by the doctrine of sovereign immunity.

Second, despite the request made by this Court at the March 21, 2008 preliminary conference, ACS still has not delivered to AWF a copy of its contract with the State of Delaware. Consequently, there is no evidence demonstrating that ACS enjoys sovereign immunity by virtue of that contract. Absent such evidence, ACS stands in no different position than any other entity who performs services for Delaware pursuant to a contract. Notably, ACS cites no authority for the proposition that an independent contractor such as ACS enjoys sovereign immunity. *See generally*, *Boyle v. United Technologies Corp.*, 487 U.S. 500, (1988) (Federal Torts Claims Act "retention of sovereign immunity for the Government's discretionary acts does not imply a defense for the benefit of contractors who participate in those acts").

Third, given its decision to withhold the best available evidence, ACS claims its sovereign immunity status solely upon a mistaken phrase appearing in the original Complaint. Although AWF did refer to ACS as an "authorized agent" in its original Complaint, AWF did not do so to suggest that ACS was the equivalent of the State of Delaware, as ACS now implies. AST-ACS Memo at 21-22. Rather, it did so only to convey that ACS received and reviewed the unclaimed property report submitted by Empire and/or AST (and/or possibly ACS itself) on which was listed Tertiaire's Empire Shares. ACS grabs hold of this phrase, declares it to be a "judicial admission," and invokes the general rule is that a party is bound by admissions made in pleadings. *Id*. at 19. That rule, however, does not apply where – as here – the party explains the error in a subsequent pleading or by amendment. *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859-60 (9th Cir.1995), *cert. denied*, 116 S. Ct. 170 (1995) ("[A] statement in a complaint may serve as a

judicial admission. . . . Where, however, the party making an ostensible judicial admission

explains the error in a subsequent pleading or by amendment, the trial court must accord the

explanation due weight."); *accord*, *Provident Energy Assoc. v. Bullington*, 77 Fed.Appx. 427,

430 (9th Cir. 2003) (Unpub.) ("A statement of fact made by a party in its pleadings is considered

a judicial admission, and is conclusive with respect to that fact unless the pleading is amended or

the statement is otherwise withdrawn.").  AWF explained the error in open Court during the

March 21, 2008 preliminary conference, and – as even ACS concedes – corrected it in the

Amended Complaint.  AST-ACS Memo at 19 (AWF "remov[ed] these admissions from the

Amended Complaint").

Fourth, "when the [Delaware] Legislature authorizes the State to enter into a

contract, the State implicitly waives the protection of sovereign immunity for breach of that

contract."  *Quereguan v. New Castle County*, 2006 WL 1215193 at *3 (Del. Ch. 2006)(footnote

omitted).  As stated by the Delaware Supreme Court:

> It must be assumed that the General Assembly, in granting to the State
> Highway Department the power to contract, intended that it should have
> power to enter into only valid contracts. A valid contract is one which has
> mutuality of obligation and remedy between the parties to it. 1 Williston
> on Contracts (3rd Ed.) § 1. It follows, therefore, that in authorizing the
> State Highway Department to enter into valid contracts ***the General
> Assembly has necessarily waived the State's immunity to suit for breach
> by the State of that contract.***

*George & Lynch, Inc. v. State*, 197 A.2d 734, 736 (Del. 1964) (emphasis added).  Thus, by

entering into a contract with ACS, Delaware itself waived sovereign immunity as to a breach of

that contract.  Accordingly, ACS has no sovereign immunity to invoke.

ACS enjoys no sovereign immunity.  As to this issue, the AST-ACS Motion must

be denied.

31

1049289.2

## VIII.

### THE AMENDED COMPLAINT STATES
### A CLAIM FOR NEGLIGENCE AGAINST ACS

The Amended Complaint alleges the existence of a contract between AST and ACS pursuant to which AST delegated to ACS some portion of its authority to determine whether Empire shares were "abandoned." Am. Compl. ¶¶ 49-54. That contract (filed under seal at the request of ACS) includes mutual indemnity provisions by which AST and ACS each indemnify the other against their respective negligence in carrying out the contract obligations, provided that the negligent party is given the opportunity to defend the non-negligent party, including selecting counsel.

AWF respectfully requests that this Court take judicial notice of the fact that AST, initially represented by the Kane Kessler firm, previously filed an Answer with a Cross-Claim against ACS. (Docket No. 13.) Upon information and belief, AST then successfully invoked the indemnity provision of the AST-ACS contract. To that end, AST no longer is represented by Kane Kessler; it is now represented by the Obermayer Rebmann firm, who from the outset of this litigation also represented ACS. AWF respectfully suggests that, as between AST and ACS, ACS already has admitted that it was negligent in carrying out the AST-ACS contract.

Wearing its other hat, as an independent contractor for Delaware, ACS was negligent in carrying out duties specified in the Delaware escheatment statute, such as analyzing the abandoned property report filed by Empire and/or AST. *See* 12 Del. Code § 1199(a). Given the fact that there was a wrongful escheatment, it obviously breached those duties.

The Amended Complaint states a claim for negligence against ACS. As to this issue, the AST-ACS Motion must be denied.

## IX.

### THE AMENDED COMPLAINT STATES
### A CLAIM FOR NEGLIGENCE PER SE AGAINST ACS

The Delaware escheatment statute, like all other unclaimed property statutes predicated upon UUPA(1981) was enacted for two purposes: protect unknown property owners by locating them and restoring their property to them; and give the state, rather than the holders of unclaimed property, the benefits of use of such property. *See Azure Ltd. v. I-Flow Corp.*, 77 Cal.Rptr.3d 463, 465 (Cal. Ct. App. 4th Dist. 2008) (citation omitted). The first purpose, therefore, is to protect the public.

Given that a premature, wrongful escheatment occurred in this case, it is obvious that ACS deviated from the standard of conduct defined in the Delaware escheatment statute. *See generally*, 12 Del. Code §§ 1198(9)(a), 1201(a)(1), 1203(b), 1203(d)(1)-(3).

The Amended Complaint states a claim for negligence *per se* against ACS. As to this issue, the AST-ACS Motion must be denied.

## X.

### THE AMENDED COMPLAINT STATES A
### CLAIM FOR BREACH OF CONTRACT AGAINST ACS

The Amended Complaint alleges the existence of a contract between AST and ACS pursuant to which AST delegated to ACS some portion of its authority to determine whether Empire shares were "abandoned." Am. Compl. ¶¶ 49-54. It alleges also that neither AST nor ACS maintains its principal place of business in Delaware. *Id.* ¶¶ 3-4. AWF's breach of contract claim against ACS, therefore, likely is not governed by Delaware law. Accordingly, ACS's analysis under Delaware law is inapposite.

AST owes a legally cognizable duty to Tertiaire/AWF regarding Tertiaire's

Empire Shares, 6 Del. Code § 8-407, 12 Del. Code §§ 1203(b) & (d)(1)-(3).  The AST-ACS

contract obligates ACS to "identify for AST the minimum due diligence" required by Delaware

to be satisfied before property may be deemed "abandoned."  Those due diligence requirements

are intended to protect shareholders such as Tertiaire/AWF from acts and omissions that result in

premature, wrongful escheatments.

Upon the facts currently known, it appears Tertiaire/AWF is a third-party

beneficiary of the AST-ACS contract.  Discovery, however, has yet to commence, and may

reveal additional information supporting AWF's claim.

The Amended Complaint states a claim against ACS for breach of contract.  As to

this issue, at this point of the litigation, the AST-ACS Motion must be denied.


## XI.

### THE AMENDED COMPLAINT STATES A
### CLAIM FOR CONVERSION AGAINST ACS

ACS acknowledges that "conversion" under Delaware law is the act of dominion

wrongfully exerted over the property of another, in denial of his right, or inconsistent with it, and

that "shares are converted by any act or control or dominion without the stockholder's authority

or consent, and in disregard, violation, or denial or his rights as a stockholder of the company."

AST-ACS Memo at 30 (citation omitted).  The Amended Complaint alleges that ACS did

precisely that.

The Amended Complaint, for example, explains the origin of the corporation-

shareholder relationship between Empire and Tertiaire, a merger between ITI and Empire; that

following the merger Empire issued 30,426 of its shares to Tertiaire to replace 40 shares of ITI

owned by Tertiaire prior to the ITI-Empire merger.  Am. Compl. ¶¶ 8-16.  These allegations

(which must be accepted as true for purposes of the AST-ACS Motion) make Empire an issuer of

intangible ownership interests in a corporation.  As a matter of law, "the issuer of any intangible

ownership interest in a corporation … shall be deemed a holder of such property."  12 Del. Code

§ 1198(7).  Subchapter IV of the Delaware escheatment statute defines "holder" as "any person

having ***possession, custody or control of the property of another person*** …."  *Ibid* (emphasis

added).

   The Amended Complaint then alleges that ACS, through its contract with AST,

had and exercised the authority to determine whether Tertiaire's Empire Shares qualified as

"abandoned" property, that ACS made such a determination, albeit erroneously, and therefore

instructed AST and/or Empire to cancel Tertiaire's Empire Shares certificate, and to execute and

deliver a duplicate certificate to the Delaware Escheator.  It alleges further that all these acts and

omissions by ACS occurred prior to such delivery.  Am. Compl. ¶¶ 49-54.  These allegations

satisfy the elements of conversion stated above.

   The Amended Complaint further alleges that ACS committed these acts even

though a full five-year period of dormancy had not run against Tertiaire's Empire Shares.  Am.

Compl. ¶ 25.  This allegation makes wrongful ACS's exercise of control over Tertiaire's Empire

Shares.

   All these allegations are incorporated into Count VII of the Amended Complaint.

Am. Compl. ¶ 56.  Count VII, therefore, alleges facts sufficient to sustain a claim for conversion

against ACS.

   Accordingly, the Amended Complaint states a claim for conversion against ACS.

As to this issue, the AST-ACS Motion must be denied.

1049289.2

## CONCLUSION

For the reasons set forth herein, plaintiff A.W. Financial Services, S.A.,

respectfully requests that the AST-ACS Motion be denied in all respects.

Dated:  Garden City, New York
          July 9, 2008

_____/s/_____
Jon Schuyler Brooks (JB7218)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, New York 10103
(212) 977-9700 (phone)
(212) 262-5152 (fax)

*Attorney for Plaintiff*
*A.W. Financial Services, Inc.*

1049289.2

Table of Contents

Page

Table Of Authorities ......................................................................................................... iii

Preliminary Statement ........................................................................................................2

Statement of Facts ..............................................................................................................3

Argument .............................................................................................................................6

I.      The Federal Rules of Civil Procedure Bar Portions of the AST-ACS
        Motion to Dismiss ..................................................................................................6

        A.      AST's Motion Must be Limited to AWF's Breach of Contract
                Claim ...........................................................................................................7

        B.      ACS's Motion May Not Challenge AWF's Conversion Claim...............7

II.     Choice of Law .........................................................................................................8

III.    Delaware Law Does Not Bar ..................................................................................8

Any Claim by AWF against AST .......................................................................................8

        A.      Introduction .................................................................................................8

        B.      History of Section 1203 ..............................................................................9

        C.      Section 1203(b) Applies to this Case .......................................................14

        D.      Section 1203(b) Requires Good Faith.......................................................16

        E.      AST Cannot Satisfy the Section 1203(b) Good Faith Test......................17

                1.      "Reasonable Attempt to Comply" with Subchapter IV ...............17

                        (A)     No Period of Dormancy as to Dividends .........................18

                        (B)     No Period of Dormancy as to Communications .............19

                        (C)     No Period of Dormancy as to Whereabouts ...................21

                2.      "Reasonable Basis for Believing Property Abandoned" ...........23

                3.      "Reasonable Commercial Standards of Practice"......................24

IV.     The Amended Complaint States a  Claim for Negligence against AST ............25

V.      The Amended Complaint States a  Claim for Breach of Contract Against
        AST .......................................................................................................................27

VI.     The Amended Complaint States a  Claim for Conversion against AST.............28

VII.    Sovereign Immunity does not .............................................................................29

Bar Any Claim by AWF against ACS .............................................................................29

VIII.   The Amended Complaint States  a Claim for Negligence against ACS............32

IX.     The Amended Complaint States  a Claim for Negligence Per Se against
        ACS.......................................................................................................................33

Table of Contents
(continued)

Page

X.     The Amended Complaint States a  Claim for Breach of Contract Against
       ACS.................................................................................................................33

XI.    The Amended Complaint States a  Claim for Conversion against AST...........................34

Conclusion ..................................................................................................................36

ii

1049289.2