UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                      :

A.W. FINANCIAL SERVICES, S.A., as successor   :
in interest to TERTIAIRE INVESTISSEMENT, S.A.,:
                                        :

                   Plaintiff,        :

                                        :

         -against-               :

EMPIRE RESOURCES, INC., AMERICAN STOCK :
TRANSFER & TRUST COMPANY, and          :
AFFILIATED COMPUTER SERVICES, INC.,      :

                Defendants.      :
                                        :
-----------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/29/09

07 Civ. 8491 (SHS)

ORDER & CERTIFICATE
OF QUESTIONS OF LAW

SIDNEY H. STEIN, U.S. District Judge.

     This is a diversity action that raises important and novel questions about Delaware's escheat law. Without the benefit of any relevant precedent from the Delaware courts, the most prudent way forward is to ask the Supreme Court of Delaware for its interpretation of Delaware's escheat law.

     Under the Rules of the Supreme Court of Delaware, a "United States District Court . . . may, on motion or sua sponte, certify to [the Supreme Court of Delaware] for decision a question or questions of law arising in any matter before it." Del. Sup. Ct. R. 41(a)(ii); see also Del. Const. art. IV, § 11(8). In this action, I have determined sua sponte that certification is proper.

     Thus, in accordance with the Supreme Court of Delaware's procedures, the following Certificate of Questions of Law describes the nature of this action, the reasons for certification, and the questions to be certified. The Certificate's subject headings are "substantially in the form set forth in" the Supreme Court of Delaware's "Official Form K." Del. Sup. Ct. R. 41(c)(i).

## CERTIFICATE OF QUESTIONS OF LAW

This 29th day of January, 2009, the Court having found that:

**(1)    The nature and stage of the proceedings are:**

This action involves the escheatment of stock to the State of Delaware. Plaintiff A.W.
Financial Services, S.A. ("A.W. Financial"), a foreign corporation, owned shares of Empire
Resources, Inc. ("Empire"), a Delaware corporation. After A.W. Financial's shares of Empire
were turned over to the State of Delaware as escheated property, A.W. Financial brought this
action against three defendants alleging that the escheatment of its stock violated Delaware
escheat law. The first named defendant, Empire, issued the escheated stock. The second named
defendant, American Stock Transfer & Trust Co. ("American Stock"), had a contract with
Empire to serve as Empire's transfer agent and to keep track of Empire's shareholders. The third
named defendant, Affiliated Computer Services, Inc. ("Affiliated Computer"), worked with
American Stock to find escheated shares and, through a contract with the State of Delaware,
allegedly sold A.W. Financial's shares of Empire after they had been turned over to the State.

A.W. Financial asserts a number of causes of action, including negligence, breach of
contract, breach of fiduciary duties, and conversion. It seeks compensatory damages from all
defendants and specific performance from Empire.

Defendants have moved under Fed. R. Civ. P. 12(b)(6) to dismiss all of A.W. Financial's
claims. Defendants argue that A.W. Financial has failed to state a claim for relief under each of
its causes of action. Defendants also maintain that they are immune from suit under a section of
Delaware escheat law, Del. Code Ann. tit. 12, § 1203.

2

(2)    **The following facts are undisputed:**[1]

In 1994, Tertiaire Investissement S.A. purchased forty shares of Integrated Technology USA, Inc. (Am. Compl. ¶ 7.) Integrated Technology later merged with Empire, and as a result of the merger, Tertiaire's forty shares of Integrated Technology became 30,426 shares of Empire.

By 2000, "Tertiaire Investissement S.A." had become "Tertiaire Development S.A.," and the company wrote to Empire "inquiring about its shares." (Id. ¶ 10.) Tertiaire received a response from American Stock, Empire's transfer agent, stating: "[We] acknowledge your recent letter regarding the loss of the above certificates [IT0065], against which we have placed a 'STOP TRANSFER' notation on our records." (Id. ¶ 11.) Tertiaire was then asked to submit an "Affidavit of Loss and Indemnity Agreement" and to purchase a surety bond. (Id. ¶ 13.) These were required, American Stock said, before it would provide a replacement certificate for Tertiaire's shares.

In fact, Tertiaire had not lost its original stock certificate; it had never gotten one in the first place. (Id. ¶ 12.) Nevertheless, Tertiaire agreed to submit the requested affidavit and to purchase the surety bond. (Id. ¶ 14.) It received a replacement certificate from American Stock less than a week later. (Id. ¶ 16.)

In 2004, four years and five months after Tertiaire obtained the replacement stock certificate, Tertiaire's shares of Empire were turned over to the State of Delaware as escheated property. (Id. ¶ 17.) As alleged in the Amended Complaint, it was "Empire—either directly or through [American Stock]"—that delivered the shares to Delaware. (Id. ¶ 17.)

It is apparent from the Amended Complaint and moving papers that A.W. Financial—the successor in interest to Tertiaire—does not know how or why defendants determined that

---

[1] Because this Certificate is issued in the context of a motion to dismiss, the following facts are drawn from the Amended Complaint and are presumed to be true.

3

Tertiaire's shares of Empire had become escheatable. A.W. Financial also lacks information about what role each defendant played in the escheatment and how ownership of the shares was transferred to Delaware. In particular, the Amended Complaint is silent about whether the shares were transferred to Delaware by means of a duplicate stock certificate or by some other means. At a court conference, counsel for American Stock also expressed uncertainty about how the shares were transferred to Delaware but did represent to the Court that the shares were not transferred by means of a duplicate stock certificate. (Hr'g, Jan. 27, 2009.)

What seems clear, at least as alleged in the Amended Complaint, is that A.W. Financial wrote to Empire in 2006 asking that its shares be re-registered under its new name, "A.W. Financial Services S.A." (Id. ¶ 19.) Shortly thereafter, A.W. Financial learned "through serial conversations and correspondence with Empire, [American Stock,] and [Affiliated Computer] . . . that the Empire shares owned by Tertiaire had been escheated by Empire, through its authorized agent [American Stock] to the State of Delaware, through Affiliated Computer." (Id. ¶ 21.)

A.W. Financial then brought this action claiming that its shares of Empire were turned over to the State of Delaware in violation of Delaware's escheat law. As A.W. Financial understands the escheat law, stock does not qualify as escheatable until it has been dormant for at least five years. (Id. ¶ 25.) The stock at issue here, A.W. Financial claims, was escheated before the five-year dormancy period had elapsed.

A.W. Financial contends that when Tertiaire communicated with defendants regarding the replacement stock certificate, it restarted the clock on the five-year dormancy period.[2] The

---

[2] A.W. Financial also maintains that it restarted the dormancy clock by writing to Empire in January 2002 (Hr'g, Jan. 27, 2009), and A.W. Financial has offered that correspondence as an exhibit in opposition to defendants' motion to dismiss (Letter from Hervé Debache, Chairman, Tertiaire Developpement, to Empire Resources, Inc. (Jan.

4

replacement stock certificate was issued on May 30, 2000, and the shares were turned over to Delaware on October 20, 2004. (Id. ¶¶ 10, 17.) Thus, according to A.W. Financial, the period of dormancy had not yet elapsed when defendants delivered the shares to Delaware, as the shares were escheated only four years and five months after the replacement certificate was issued. (Id. ¶ 25.)

In addition, A.W. Financial maintains that its address should have been stored in defendants' records. When Tertiaire submitted the affidavit of loss to obtain a replacement stock certificate, the affidavit stated that Tertiaire was "presently known as Tertiaire Development, S.A." and that its address was "47 Rue de Chaillot, Paris 75116." (Id. ¶ 15.) Had defendants checked their records, A.W. Financial claims, they would have discovered Tertiaire's contact information and concluded that the stock was not escheatable. Thus, A.W. Financial cites defendants' alleged failure to check their records as a further reason that the escheatment of stock was wrongful.[3]

None of this is to say, however, that the allegedly wrongful escheatment caused A.W. Financial to lose the entire value of its stock. It appears that A.W. Financial contacted Delaware about its escheated shares, and Delaware remitted to A.W. Financial the money Delaware made in selling them. That fact is not explicitly alleged in the Amended Complaint, but it appears in defendants' moving papers, and A.W. Financial does not dispute it.

Now, A.W. Financial brings this action to recover additional compensation beyond what it has already obtained from Delaware. To that end, A.W. Financial notes that the value of its

---

9, 2002), Ex. E to Decl. of Jon Schuyler Brooks, July 9, 2008). The Amended Complaint, however, makes no reference to such a letter, and thus it is not properly before the Court on this motion to dismiss.

[3] In its opposition brief, A.W. Financial makes another argument about dividend payments, claiming that dividend payments for its shares could not have been left unclaimed for the requisite five-year period. There are, however, no facts in the Amended Complaint concerning dividend payments, and thus A.W. Financial's claims concerning dividend payments are not properly before the Court on this motion to dismiss.

shares rose dramatically after they were sold by Delaware.  The shares were sold in February

2005 for around $4 per share.  (Id. ¶ 18.)  Yet just one month later, Empire's stock traded at

$32.61 per share, and three months later, in May 2005, the stock reached $57.87 per share.  (Id.

¶ 22.)  According to A.W. Financial, therefore, the premature sale of its shares—which

defendants brought about by incorrectly determining that the stock was escheatable—caused

A.W. Financial at least $870,487 in damages.  That figure is "the difference between the value of

the shares when liquidated by the State of Delaware . . . and when [A.W. Financial] first inquired

about selling them."  (Id. ¶ 28.)

**(3)     The questions of law set forth below should be certified to the Supreme Court of the
State of Delaware for the following reasons:**

This Certificate poses four questions of law about Delaware's escheat statute.  It asks

(I) whether a recent amendment to the escheat statute should apply retroactively; (II) what legal

theory, if any, a shareholder can pursue in a civil action against an issuer of stock or its transfer

agent on the ground that an escheatment of stock violated the Delaware escheat law; (III) when

an issuer or transfer agent is immune from suit under either subsection 1203(a) or subsection

1203(b) of Del. Code Ann. tit. 12, § 1203; and (IV) when allegations are sufficient to plead "bad

faith" under Del. Code Ann. tit. 12, § 1203(b).  Each of those questions is an "[o]riginal question

of law" pursuant to Del. Sup. Ct. R. 41(b)(i), as this is the "first instance" that a Delaware court

will be addressing any of them.  Each is also an "[u]nsettled question" pursuant to Del. Sup. Ct.

R. 41(b)(iii), as each "relate[s] to the . . . construction or application of a statute of [Delaware]

which has not been, but should be, settled by the Court."  Accordingly, the four questions are fit

for certification to the Supreme Court of Delaware.

**(4)    The important and urgent reasons for an immediate determination:**

The escheatment of stock in Delaware is an important issue both for Delaware corporations and for their shareholders. Stock and other securities often escheat to the issuing company's state of incorporation. See Delaware v. New York, 507 U.S. 490, 505-507 (1993). As a result, Delaware has an especially strong interest in providing clear law regarding the escheatment of stock, as "Delaware is the state of incorporation for fifty-seven percent of U.S. public companies and for fifty-nine percent of Fortune 500 companies." Lucian Arye Bebchuk & Assaf Hamdani, Vigorous Race or Leisurely Walk: Reconsidering the Competition over Corporate Charters, 112 Yale L.J. 553, 553 n.3 (2002). Indeed, each year Delaware takes possession of escheated property worth millions of dollars.[4] Answering the legal questions in this Certificate, therefore, will shed light on an important area of Delaware law. It will clarify the rights of shareholders—and the potential liabilities of corporations and transfer agents— when stock is escheated in violation of Delaware's escheat law.

Urgency is required in answering the questions posed by this Certificate because the Delaware legislature has recently amended the escheat law to make it easier for stock and other securities to become escheats. Effective June 30, 2008, the "period of dormancy" for any "intangible ownership or indebtedness in a corporation" is now three years, down from five years. See 76 Del. Laws 276 (2008) (amending Del. Code Ann. tit. 12, § 1198(9)). It is possible that the shorter dormancy period will lead to more stocks becoming escheats. That, in turn, may lead more shareholders to bring suits, such as this one, alleging that the stock's issuer or a transfer agent violated the escheat law. The law governing such suits should be clarified to avoid

---

[4] One source reports that Delaware collected over $370 million in escheated property in 2007, making escheatment the State's third largest source of income. See Adam Zewe, Escheating Threatens Business in Delaware, Experts Say, Sussex Countian (Delaware), Sept. 8, 2008, available at http://www.sussexcountian.com/archive/ x1001331060/Escheating-threatens-business-in-Delaware-experts-say.

confusion in trial courts and to provide guidance to the corporations and transfer agents that must

implement the new law.

(5)     **If certification is accepted, it is recommended that A.W. Financial Services, S.A., be
        appellant for purposes of the caption on any filings in the Supreme Court of
        Delaware and that Empire Resources, Inc., American Stock Transfer & Trust
        Company, and Affiliated Computer Services, Inc., be appellees for purposes of the
        caption on any filing in the Supreme Court of Delaware with respect to the
        questions certified.**

## CERTIFIED QUESTIONS

NOW, THEREFORE, IT IS ORDERED that the following questions of law are certified to the

Supreme Court of the State of Delaware for disposition in accordance with Rule 41 of the

Supreme Court:

I.      Effective June 30, 2008, the Delaware legislature amended the Delaware escheat law,
        Del. Code Ann. tit. 12, § 1198(9), by changing the definition of "period of dormancy" for
        stocks. See 76 Del. Laws 276 (2008). Does that new definition apply retroactively in
        civil actions involving stocks that were escheated prior to June 30, 2008?

II.     Plaintiff alleges that defendants incorrectly determined that its stock was escheatable and,
        as a result, improperly transferred its stock to the State of Delaware. On what legal
        theory, if any, can plaintiff base a civil action against defendants: negligence, conversion,
        breach of fiduciary duty, "failure to register," or some other cause of action?

III.    Delaware's escheat law, Del. Code Ann. tit. 12, § 1203, grants immunity in two
        circumstances. Subsection 1203(a) grants immunity to any "holder" of "property"—
        including "intangible ownership interests in corporations"—that "pay[s] or deliver[s]"
        that property to the State Escheator. Subsection 1203(b) grants immunity to a "holder
        and any transfer agent" that "deliver[s] in good faith" a "duplicate certificated security to
        the State Escheator." In a case such as this involving the escheatment of stock, which
        applies: subsection 1203(a), subsection 1203(b), or both?

IV.     When are allegations sufficient to plead that a party did not act in "good faith"—and thus
        is not entitled to immunity—under subsection 1203(b) of Del. Code Ann. tit. 12, § 1203?

## DISCUSSION

**I.     The Recent Change to the Escheat Law's "Period of Dormancy"**

A.W. Financial's primary contention is that defendants determined that its stock was escheatable before the statutory "period of dormancy" had elapsed. A.W. Financial's success in this action, therefore, depends inextricably on the meaning of "period of dormancy" in the Delaware escheat law. See Del. Code Ann. tit. 12, § 1198(9). As noted above, the Delaware legislature recently amended the statutory definition of "period of dormancy" with respect to stocks. See 76 Del. Laws 276 (2008). The first certified question, therefore, is whether the recent amendment to Del. Code Ann. tit. 12, § 1198(9) applies retroactively to civil actions, such as this one, that involve stock escheated before the effective date of the amendment, June 30, 2008.

A.W. Financial's Amended Complaint, which was filed before the law changed, relies on the former definition of "period of dormancy" in Del. Code Ann. tit. 12, § 1198(9). Under that definition, a stock became escheatable after five years of dormancy, and there was a three-part definition of "period of dormancy":

> [W]ith respect to an intangible ownership interest in a corporation, . . . the period of dormancy means a period of five years during which:
>> 1. The owner has not claimed a dividend, distribution or other sum with respect to such interest;
>> 2. The owner has not communicated in writing with the holder concerning such property or otherwise communicated with the holder concerning such property which communication is evidenced by a writing or other record prepared by the holder or its employee in the ordinary course of business; and
>> 3. At the end of which the holder does not know the current location of the owner of such property.

Del. Code Ann. tit. 12, § 1198(9) (2007); see also 65 Del. Laws 351 (1986); 66 Del. Laws 379 (1988).

The recent amendment made two changes to that definition.  First, the period of dormancy was shortened from five years to three years.  Second, the three-part definition of "period of dormancy" was eliminated.  The new statute provides:

> Notwithstanding the foregoing, "period of dormancy" means the full and continuous period of 3 years with respect to intangible ownership or indebtedness in a corporation or other entity whether or not represented by a stock certificate or other certificate of membership, bonds and other securities including fractional shares, interest, dividends, cash, coupon interest, liquidation value of stocks and bonds, funds to redeem stocks and bonds, and distributions held by financial intermediaries.

Del. Code Ann. tit. 12, § 1198(9); see also 76 Del. Laws 276 (2008).

A.W. Financial's principal claim is that its stock was escheated only four years and five months after the parties communicated about a replacement stock certificate.  That was seven months shy of the five years of dormancy required under the old definition.  Under the new definition, however, the escheatment occurred after the new three-year dormancy period.  Thus, at least with respect to communication between the parties, the escheatment of the shares appears to have been proper under the new definition, but not under former the definition.[5]

In addition, because the three-part test for dormancy has now been eliminated, whether a stock is escheatable no longer explicitly depends on whether "the holder . . . know[s] the current location of the owner of such property."  See Del. Code tit. 12, § 1198(9)(3) (2007).  The fact that defendants had A.W. Financial's address on file may be relevant under the new definition, but A.W. Financial can no longer point to an explicit statutory provision to ground its claim about defendants having its address.  Therefore, whether the new definition applies to the

---

[5] Again, A.W. Financial has submitted a letter it purportedly sent Empire in 2002. (Letter from Hervé Debache, Chairman, Tertiaire Developpement, to Empire Resources, Inc. (Jan. 9, 2002), Ex. E to Decl. of Jon Schuyler Brooks, July 9, 2008).  That letter is not properly before this Court on this motion to dismiss, as it is not referenced in the Amended Complaint.  If, however, this Court eventually considers the letter, A.W. Financial may be able to show that it communicated with Empire within the new three-year period of dormancy.  Even if that is the case, it is still important for this Court to know whether the former definition of "period of dormancy" or the new definition of "period of dormancy" applies in this action.

escheatment of stock at issue in this action must be decided before evaluating the merits of A.W. Financial's allegations.

## II.    The Legal Basis for a Claim of Wrongful Escheatment

Another fundamental question raised by this action is what legal theory A.W. Financial can pursue for an allegedly wrongful escheatment. A.W. Financial asserts a number of different claims against defendants.

First, A.W. Financial alleges that all three defendants committed negligence in determining, improperly, that its stock was escheatable. (See Am. Compl. ¶¶ 23-39.) The defendants respond that they owed no duty to A.W. Financial with respect to its stock, and thus A.W. Financial has failed to plead a negligence claim.

Second, A.W. Financial alleges that all three defendants committed conversion when they allegedly delivered the stock to Delaware in violation of the escheat law. The defendants respond that they did not exercise "dominion" or "control" over the shares, which a plaintiff must show to prevail on a conversion claim. See, e.g., McGowan v. Ferro, 859 A.2d 1012, 1040 (Del. Ch. 2004).

Third, A.W. Financial alleges that Empire—but not the other defendants—breached a fiduciary duty in wrongfully determining that the shares were escheatable. Corporations, A.W. Financial claims, owe their shareholders a fiduciary duty "to maintain accurate books and records regarding ownership of shares." (Am. Compl. ¶¶ 42-43.) According to A.W. Financial, Empire breached that duty when it or its agent improperly determined that A.W. Financial's shares of Empire were escheatable. Empire responds that corporations owe no such duty to their shareholders and, even if they did, that Empire or Empire's agent did not breach that duty when it allegedly determined that the shares were escheatable.

11

Finally, A.W. Financial asserts a "failure to register" claim against Empire, alleging that Empire "violated the relevant portions of the Uniform Commercial Code" ("UCC"). (Id. ¶ 60.) A.W. Financial does not specify which provision of the UCC it has in mind. Empire speculates that it is UCC § 8-401(a), which makes an issuer liable "to a person presenting a certificated security or an instruction for registration or to the person's principal for loss resulting from unreasonable delay in registration or failure or refusal to register the transfer." Del. Code Ann. tit. 6, § 8-401(a). Empire contends, however, that it did not violate that provision.[6]

Before turning to the sufficiency of the allegations in the Amended Complaint, a fundamental question is whether Delaware law recognizes any of A.W. Financial's claims for relief. If a plaintiff alleges that defendants incorrectly determined that its stock was escheatable and then delivered that stock to the State of Delaware, on what legal theory, if any, can the plaintiff base a civil action against defendants? Is it negligence, conversion, breach of fiduciary duty, "failure to register," some other cause of action, or none of those causes of action? An answer to that question is required before this Court can determine whether any of A.W. Financial's substantive claims survive defendants' motion to dismiss.

### III.    The Immunity Granted in Del. Code Ann. Tit. 12, § 1203(a)-(b)

Even if A.W. Financial has asserted a valid cause of action, two defendants—Empire and American Stock—claim that they are immune from suit pursuant to Del. Code Ann. tit. 12, § 1203. That section of the Delaware's escheat law provides immunity in two circumstances: Subsection 1203(a) grants immunity to any "holder" of "property" that "pay[s] or deliver[s]" the

---

[6] A.W. Financial also alleges that it was a third-party beneficiary to a contract between Empire and American Stock and to a contract between American Stock and Affiliated Computer. This Certificate need not address that cause of action for two reasons. First, Delaware's law regarding third-party beneficiaries is clearer than its law regarding escheatment, and thus there is far less need to certify a question about the third-party beneficiary claims in this action. Second, A.W. Financial's third-party beneficiary claims rest on questions about whether the alleged contracts exist and how the language of the contracts should be interpreted. Those are questions that the Supreme Court of Delaware need not take up.

property to the State Escheator, and subsection 1203(b) grants immunity to a "holder and any transfer agent" that "deliver[s] in good faith" a "duplicate certificated security to the State Escheator."

Subsection 1203(a) may apply to A.W. Financial's claims in this action. Subsection 1203(a) provides:

> (a) The payment or delivery of property to the State Escheator by any holder shall terminate any legal relationship between the holder and the owner and shall release and discharge such holder from any and all liability to the owner . . . by reason of such delivery or payment, regardless of whether such property is in fact and in law abandoned property and such delivery and payment may be pleaded as a bar to recovery and shall be a conclusive defense in any suit or action brought by such owner . . . by reason of such delivery or payment.

Del. Code Ann. tit. 12, § 1203(a). First, subsection 1203(a) applies to "property," and "property" is defined to include "intangible ownership interests in corporations, whether or not represented by a stock certificate." Id. § 1198(11). Thus, A.W. Financial's shares of Empire appear to have been "property."

Second, subsection 1203(a) grants immunity to "any holder," and "holder" is defined to include both "the issuer of any intangible ownership interest in a corporation" and "any person having possession, custody or control of the property of another person." Id. § 1198(7). Thus, Empire was a "holder" as the issuer of the shares in question, and American Stock may have been a "holder" because it had "possession, custody or control" over the shares when it transferred them to Delaware.

Third, subsection 1203(a) grants holders immunity for "any and all liability to the owner . . . by reason of such delivery or payment," and "owner" is to be "construed to . . . include any person . . . having the legal or equitable title" to the property in question. Id. § 1198(8). Thus, A.W. Financial is fairly construed as an "owner." A.W. Financial may also be construed as

13

asserting "liability . . . by reason of [a] delivery or payment" of its property to the State

Escheator. Subsection (a), therefore, may grant Empire and American Stock immunity in this

action.

Subsection 1203(b), on the other hand, may apply more directly to the escheatment at

issue here. Subsection 1203(b) provides:

> (b) Upon the delivery in good faith of a duplicate certificated security to the State
> Escheator or the registration of an uncertificated security to the State Escheator
> pursuant to § 1201 of this title, the holder and any transfer agent, registrar or other
> person acting for or on behalf of the holder in executing or delivering such
> duplicate certificate or effectuating such registration, is relieved of all liability of
> every kind to every person, including any person acquiring the original of a
> certificated security or the duplicate of a certificated security issued to the State
> Escheator, for any losses or damages resulting to any person by issuance and
> delivery to the State Escheator of the duplicate certificated security . . . .

Id. § 1203(b). Plainly, subsection 1203(b) applies to the escheatment of stock, but it is unclear

whether it applies to all escheatments of stock or only to certain escheatments of stock.

The statute refers to the "delivery in good faith of a duplicate certificated security to the

State Escheator," but the term "duplicate certificated security" is not defined. Here, the

escheatment may have involved a duplicate certificated security, as it is unclear how ownership

of A.W. Financial's shares of Empire could have been transferred to Delaware without the

issuance of a duplicate certificated security. After all, A.W. Financial retains possession of the

certificates for its shares. (Hr'g, Jan. 27, 2008.)  Nevertheless, counsel for American Stock has

represented to the Court that duplicate certificated securities were *not* used to transfer ownership

of the shares.  (Id.)

In sum, whether subsection 1203(a) or 1203(b) applies to this action must be determined.

The immunity provided by subsection 1203(a) is broad, and if it applies in this action, it likely

bars any claim that A.W. Financial might bring against defendants. Subsection 1203(b) also

14

contains a broad immunity provision, but, by its terms, subsection 1203(b)'s immunity applies only to the "delivery in <u>good faith</u>" of a duplicate stock certificate. <u>Id.</u> (emphasis added). Thus, if subsection 1203(b) applies and subsection 1203(a) does not, then defendants are immune only to the extent that they escheated the shares in good faith.

The contours of subsection 1203(b)'s "good faith" requirement are the focus of the fourth certified question. The present question asks when subsection 1203(a) or subsection 1203(b) applies to the escheatment of stock. Can they both apply at the same time? Which, if either, applies here?

## IV.    "Good Faith" Under Del. Code Ann. Tit. 12, § 1203(b)

If it is subsection 1203(b) that applies in this action, another question arises: Has A.W. Financial alleged facts that, if true, would demonstrate that defendants acted in bad faith? If A.W. Financial has made sufficient allegations of bad faith, then defendants cannot rely on subsection 1203(b) to dismiss this action; whether defendants acted in good faith—and thus whether they are immune under subsection 1203(b)—would be decided at trial.[7] But if A.W. Financial's allegations are insufficient, then defendants may invoke subsection 1203(b)'s immunity provision as a basis on which to dismiss this action.

To decide whether A.W. Financial has made sufficient allegations of bad faith, it is important to note that "good faith" in the escheatment context has a statutory definition:

> (d) For the purposes of this section, "good faith" means that:
> (1) Payment or delivery was made in a reasonable attempt to comply with this subchapter;
> (2) The person delivering the property was not a fiduciary then in breach of trust in respect to the property and had a reasonable basis for believing, based on the facts then known to the person, that the property was abandoned for the purposes of this subchapter; and

---

[7] That assumes that there is no other basis on which to dismiss this action.

15

> (3) There is no showing that the records pursuant to which the delivery
> was made did not meet reasonable commercial standards of practice in the
> industry.

Del. Code Ann. tit. 12, § 1203(d). A.W. Financial argues that the allegations in the Amended

Complaint show that defendants failed to meet each of the elements of "good faith" found in

subsection 1203(d).

First, defendants failed to act in good faith, A.W. Financial maintains, because

defendants knew—or should have known—that they had communicated with A.W. Financial's

predecessor less than five years before escheating the stock. Applying the law as it existed

before the recent amendment to the definition of "period of dormancy," A.W. Financial contends

that it clearly "communicated in writing" with defendants, see Del. Code Ann. tit. 12,

§ 1198(9)(1) (2007), when it requested a duplicate stock certificate and submitted an affidavit of

loss (see Am. Compl. ¶¶ 10-16). That communication, moreover, occurred within five years of

the escheatment, see Del. Code Ann. tit. 12, § 1198(9) (2007), and A.W. Financial alleges that if

defendants had merely checked their records, they would have discovered that the five-year

"period of dormancy" had not elapsed. Therefore, according to A.W. Financial, defendants did

not deliver the stock to Delaware in a "reasonable attempt to comply with" the escheat law. See

Del. Code Ann. tit. 12, § 1203(d)(1). Nor could defendants have "had a reasonable basis for

believing, based on the facts then known to [them], that the property was abandoned for the

purposes of [the escheat law]." See id. § 1203(d)(2). Defendants knew—or should have

known—that A.W. Financial had "inquired about its shares" less than five years before the

escheatment. As a result, defendants could not have acted in "good faith" pursuant to subsection

1203(d)(1) or (2).

16

Second, A.W. Financial argues that defendants failed to act in good faith because they should have had A.W. Financial's address on file. Again applying the pre-amendment law, A.W. Financial notes that property is only escheatable if its "holder does not know the current location of the owner of such property." Del. Code Ann. tit. 12, § 1198(9)(3) (2007). Here, however, A.W. Financial alleges defendants did know the name and address of the owner of the escheated stock, for the affidavit of loss submitted by Tertiaire stated that the company was "presently known as Tertiaire Development, S.A." and that its address was "47 Rue de Chaillot, Paris 75116." (Am. Compl. ¶ 15.) Thus, in A.W. Financial's view, had the defendants checked their files before escheating the stock, they would have found a valid name and address for the stock's owner. Their apparent failure to do so, A.W. Financial maintains, provides yet another reason that defendants did not make a "reasonable attempt to comply with" the escheat law—and, therefore, another reason why defendants did not act in "good faith." See Del. Code Ann. tit. 12, § 1203(d)(1).

Finally, A.W. Financial contends that defendants' "records" failed to "meet reasonable commercial standards of practice in the industry." See id. § 1203(d)(3). At this early stage of the litigation, none of defendants' records has been introduced as evidence. Nevertheless, those records must fall short of industry standards, A.W. Financial claims, as the escheatment was so plainly premature. Thus, with the benefit of discovery, A.W. Financial expects to uncover evidence of the defendants' bad faith with respect to their records.

The question, then, is whether A.W. Financial's allegations, if true, are sufficient to show that defendants failed to act in good faith pursuant to Del. Code Ann. tit. 12, § 1203(b) and § 1203(d). One view of A.W. Financial's allegations is that defendants simply made a mistake about whether the stock was escheatable. Bad faith usually involves more than just "bad

17

judgment or negligence"; rather, bad faith usually involves "the conscious doing of a wrong because of dishonest purpose or moral obliquity." Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P., 624 A.2d 1199, 1208 n.16 (Del. 1993) (quoting Black's Law Dictionary 72 (5th ed. 1983)). Nothing along those lines has been alleged here. Nevertheless, in the context of escheatment, Delaware law provides a unique definition of "good faith." Id. § 1203(d). As the Delaware courts have never interpreted subsection 1203(d), there are no standards or examples by which to judge whether the allegations in this action are sufficient to plead a lack of "good faith" under that subsection. As a result, this Court requests guidance from the Supreme Court of Delaware in determining whether A.W. Financial's allegations are enough to plead that defendants failed to act in good faith pursuant to subsection 1203(d).

### ORDER OF BRIEFING

In accordance with Supreme Court Rule 41, it is recommended that briefs shall be filed in the Supreme Court in the following order: defendants, as the parties moving to dismiss this action, shall file their briefs first, followed by plaintiff A.W. Financial.

### CONCLUSION

The defendants' motions to dismiss are hereby dismissed without prejudice pending the disposition of this Certificate. The Clerk of this Court shall file with the Clerk of the Supreme Court of Delaware six certified copies of this Certificate. Del. Sup. Ct. R. 41(c)(ii).

Dated: New York, New York
       January 29, 2009

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.

18