Jon Schuyler Brooks (JB7218)
jbrooks@phillipsnizer.com
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, New York 10103-0084
(212) 977-9700
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

A.W. FINANCIAL SERVICES, S.A., as successor in interest to TERTIAIRE INVESTISSEMENT, S.A.

Plaintiff,

v.

EMPIRE RESOURCES, INC., AMERICAN STOCK TRANSFER & TRUST COMPANY, and AFFILIATED COMPUTER SERVICES, INC.,

Defendants.

---------------------------------------------------------------------x

**ECF CASE –Filed Electronically**

**07-CV-8491 (SHS)(RLE)**

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

PHILLIPS NIZER LLP
666 FIFTH AVENUE
NEW YORK, NY 10103
*Attorney for Plaintiff*

Plaintiff A.W.F. S.A., also known and doing business as A.W. Financial Services ("AWF"), as successor-in-interest to Tertiaire Investissement, S.A. ("Tertiaire"), respectfully submits its proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

***The Plaintiff***

1. Tertiaire Investissement S.A. ("Tertiaire") was a French company established on or about September 25, 1992.

2. On or about February 2, 1996, Tertiaire merged with Tertiaire Developpement S.A., a French company established on or about March 1, 1994 ("Developpment"), with Developpement being the surviving entity.

3. On or about March 7, 2002, Developpement merged with H.D. Finance S.A., a French company established on or about December 22, 1993 ("HDF"), with HDF being the surviving entity.

4. Immediately after Developpement merged with HDF, HDF merged with A.W.F. S.A., a French company established on or about December 9, 1993 ("AWF"), with AWF being the surviving entity.

5. AWF also is known, and sometimes does business, as A.W. Financial Services.

6. Hervé Debache was a principal and officer of each of the foregoing entities.

7. Through the foregoing mergers, AWF became successor-in-interest to Tertiaire.

***Tertiaire's Empire Shares***

8. On or about January 11, 1994, Tertiaire purchased 40 shares of Integrated Technology USA, Inc. ("ITI").

9. ITI was a Delaware corporation.

10. Since at least October 3, 1996, ITI's transfer agent was defendant American Stock Transfer & Trust Company ("AST").

11. In or about 1999, ITI merged with defendant Empire Resources, Inc. ("Empire").

12. As a result of the merger, Tertiaire's 40 shares of ITI became 30,426 shares of Empire ("Tertiaire's Empire Shares").

13. Tertiaire's Empire Shares were represented initially by Certificate No. IT 0065 issued by Empire.

14. In or about April 2000, Hervé Debache – using Developpement's letterhead – wrote to Empire, and advised Empire (a) Developpement had merged with Tertiaire and (b) Tertiaire never received Certificate No. IT 0065.

15. Empire's transfer agent was co-defendant AST.

16. Empire instructed AST to respond to Mr. Debache.

17. On or about May 4, 2000, AST sent an Affidavit of Loss and Indemnification Agreement ("Affidavit of Loss") to Tertiaire.

18. On or about May 11, 2000, Mr. Debache, again using Developpement's letterhead, sent a fax to Jonathan Bernstein of Empire forwarding the Affidavit of Loss and asking for help.

19. After discussions with Empire, on or about May 22, 2000, Mr. Debache – in his capacity as President of Developpement – completed the Affidavit of Loss.

20. On or about May 24, 2000, Mr. Debache sent the completed Affidavit of Loss together with a check made payable to AST in the amount of $1,003.84 for payment of the premium on the required surety bond (the "Surety Bond Premium Check"), to AST, specifically to the attention of Barry Rosenthal, by Airborne Express, airbill number 8239709015 (the "Airborne Airbill").

21. Upon receipt of the completed Affidavit of Loss, Empire – either directly or through AST – issued a replacement original certificate for Tertiaire's Empire Shares, Certificate No. IT 0328, on or about May 30, 2000.

22. On or about June 4, 2000, AST sent Certificate No. IT 0328 to Developpement via FedEx, airbill number 400-7146 9171 (the "FedEx Airbill").

***Empire's Failure to Re-Register Tertiaire's Empire Shares***

23. As completed by Mr. Debache, the Affidavit of Loss specified Tertiaire was now known as "Tertiaire Developpment, S.A.," and provided its address as 47 Rue de Chaillot, Paris, France.

24. Subsequent to the receipt of the completed Affidavit of Loss, neither Empire nor AST ever re-registered Tertiaire's Empire Shares in the name of Tertiaire Developpement S.A.

25. Furthermore, subsequent to the receipt of the completed Affidavit of Loss, neither Empire nor AST ever changed the address of record for Tertiaire's Empire Shares to 47 Rue de Chaillot, Paris, France.

***Empire and/or AST knew or should have known Tertiaire was a French company located in Paris, France***

26. At the time Tertiaire purchased the 40 shares of ITI, Tertiaire's office was located at 12 Rue Tronchet, Paris, France.

27. Sidley & Austin acted as special counsel to ITI in connection with the offering by ITI of its shares.

28. On April 28, 1994, Irving L. Rotter of Sidley & Austin sent, among other things, certificate number 64 representing 40 shares of ITI stock to Tertiaire at is office in Paris, France.

29. As early as April 28, 1994, therefore, ITI knew Tertiaire's address was 12 Rue Tronchet, Paris, France.

30. From the time Developpement was established until after its merger with Tertiaire, its head office also was located at 12 Rue Tronchet, Paris, France.

31. On September 9, 1996, in connection with ITI's proposed initial public offering, ITI itself sent to Tertiaire a Questionnaire Regarding NASD Affiliations (the "NASD Questionnaire").

32. The NASD Questionnaire was sent under cover of an ITI FAX Cover Letter, to "011-33-1-4266-5022," the dedicated fax line located in the offices shared by Tertiaire and Developpement at 12 Rue Tronchet in Paris, France.

33. The ITI Fax Cover Letter directed Mr. Debache to "fill out the questionnaire and sign it all in the name of Tertiaire Investissement."

34. Mr. Debache completed the NASD Questionnaire as instructed, indicating Tertiaire's address as being 12 Rue Tronchet, Paris, France, and returned it to ITI.

35. On or about September 10, 1996, Ed Abramson of ITI sent a FAX Cover Letter to Herve Debache on the same dedicated fax line located in the offices shared by Tertiaire and Developpement in Paris, France, confirming Tertiaire "presently owns 40 shares of [ITI], which will become 30,426 shares after the split."

36. As the successor-in-interest to ITI, Empire knew or should have known Tertiaire was a French company located in Paris, France.

37. As the transfer agent for both ITI and Empire, AST knew or should have known Tertiaire was a French company located in Paris, France.

***Empire and/or AST knew or should have known Tertiaire merged with Developpement, and that Developpment was a French company located in Paris, France***

38. In or about March 1998 (i.e., subsequent to the merger with Tertiaire), Developpement relocated its office from 12 Rue Tronchet to 47 Rue de Chaillot in Paris, France.

39. The correspondence from Developpement to both Empire and AST in April through May 2000 specified Developpement's address as being 47 Rue de Chaillot, Paris, France.

40. As already noted, the Affidavit of Loss delivered to AST stated Tertiaire now was known as Developpement, and specified Developpement's address as being 47 Rue de Chaillot, Paris, France.

41. Similarly, the Surety Bond Premium Check was drawn on the account of Developpement, and specified Developpement's address as being 47 Rue de Chaillot, Paris, France.

42. The Airborne Airbill by which Developpement delivered the Affidavit of Loss and Surety Bond Premium Check to AST reads it was being sent by Developpement, and specifies Developpement's address as being 47 Rue de Chaillot, Paris, France.

43. Furthermore, AST delivered the replacement original certificate for Tertiaire's Empire Shares – Certificate Number IT 0328 – to Developpement, not to Tertiaire, and the FedEx Airbill by which it did so was addressed to Developpement at 47 Rue de Chaillot, Paris, France.

44. Moreover, on or about January 9, 2002, Mr. Debache sent another fax to Jonathan Bernstein of Empire reiterating Tertiaire "has been absorbed by" Developpement, and the letterhead specifies Developpement's address as being 47 Rue de Chaillot, Paris, France.

45. By as early as April 2000, and no later than January 2002, Empire and/or AST knew or should have known Tertiaire had merged with Developpement, another French company located in Paris, France.

46. Subsequent to the mergers in March 2002 of Developpement into HDF and HDF into AWF, AWF continued to maintain its offices at 47 Rue de Chaillot, Paris, France.

***Empire – directly or through AST – prematurely escheated Tertiaire's Empire Shares and Tertiaire's Empire Dividends***

47. In or about June 2003, Empire declared its first ever dividend.

48. That first dividend was in the amount of $0.04 per share.

49. On or about July 16, 2003, Empire issued its first ever dividend checks.

50. The July 16, 2003 dividend check corresponding to Tertiaire's Empire Shares was made payable not to Developpement, but to Tertiaire.

51. Prior to issuing that July 16, 2003 dividend check to Tertiaire, Empire – directly or through AST – withheld twenty-five percent (25%) of the dividend due against taxes.

52. The July 16, 2003 dividend check issued to Tertiaire was in the amount of $912.78.

53. Empire, through AST, sent that July 16, 2003 dividend check (if at all) to Tertiaire Investissment, "c/o Herve of Gilles Debache, Beit America, King Saul 35, Tel Aviv 61334 Israel."

54. Tertiaire, however, never had an office in Israel.

55. In or about March 1994, prior to Developpement's merger with Tertiaire (and therefore unrelated to Tertiaire's original purchase of the 40 shares of ITI), Developpement established a subsidiary in Israel, "Tertiaire Developpment Israel Ltd."

56. AST claims that July 16, 2003 dividend check was returned to AST as undeliverable.

57. AST has failed to produce the envelope in which it allegedly mailed the July 16, 2003 dividend check.

58. On or about August 23, 2003, Empire – through AST – marked the record for Tertiaire's Empire Shares as having a "bad address."

59. Although Empire continued to declare quarterly dividends, and although dividends continued for some time to be allocated to Tertiaire's Empire Shares, no dividend checks were issued to Tertiaire (or Developpement) after July 2003.

60. Empire was and is a Delaware corporation.

61. Pursuant to Delaware law, by March 2004, Empire was required to report all property in its possession, custody or control that had become abandoned during calendar 2003.

62. On or about January 1, 2003, Defendants AST and Affiliated Computer Services, Inc. ("ACS") entered into a Service Agreement pursuant to which ACS would assist AST in identifying allegedly abandoned property.

63. Empire authorized AST to engage ACS to review the property in Empire's possession, custody or control.

64. Empire – directly or through AST, and with or without the assistance of ACS – determined Tertiaire's Empire Shares were abandoned by December 31, 2003, a date only three years and seven months after the replacement original certificate for Tertiaire's Empire Shares (Certificate Number IT 0328) was issued.

65. On or about October 20, 2004, Empire – directly or through AST, and with or without the assistance of ACS – escheated to the Delaware Escheator Tertiaire's Empire Shares.

66. It did not, however, deliver a duplicate original certificate for Tertiaire's Empire Shares.

67. On that same day, Empire – directly or through AST, and with or without the assistance of ACS – escheated to the Delaware Escheator also the following dividends (net of taxes withheld) to which Tertiaire (or its successor in interest) was then entitled ("Tertiaire's Empire Dividends"):

a. July 16, 2003 $ 912.78;

b. October 1, 2003 $ 912.78;

c. January 7, 2004 $1,825.56;

d. April 19, 2004 $ 912.78;

e. July 19, 2004 $ 912.78; and

f. October 5, 2004 $ 912.78.

68. Prior to escheating Tertiaire's Empire Shares and Tertiaire's Empire Dividends on October 20, 2004, neither Empire nor AST checked its records to determine whether it had other addresses or contact information for Tertiaire or its successor in interest.

69. Prior to escheating Tertiaire's Empire Shares and Tertiaire's Empire Dividends on October 20, 2004, neither Empire nor AST attempted to contact Tertiaire or its successor in interest either by telephone or facsimile.

70. At the time Empire – directly or through AST – escheated Tertiaire's Empire Shares and Tertiaire's Empire Dividends to the Delaware Escheator, ACS not only was assisting AST to identify allegedly abandoned property pursuant to the Service Agreement, but also was under contract with the State of Delaware to process and review property submitted as abandoned.

71. In or about February 2005, the State of Delaware sold Tertiaire's Empire Shares, in aggregate, for one hundred seventeen thousand two hundred fifty and 83/100 dollars ($117,250.83).

***AWF Learns About the Premature Escheatment After the Fact***

72. On or about March 29, 2006, AWF wrote to Empire to advise it was the successor in interest to Tertiaire, and requested registration in AWF's name of Tertiaire's Empire Shares.

73. Through subsequent serial correspondence, culminating in a May 2, 2006 letter from AST to AWF, AWF learned for the first time Empire – directly or through AST – escheated Tertiaire's Empire Shares to the State of Delaware.

***AWF's Compensatory Damages***

74. On May 3, 2006, shares of Empire traded at $57.87 per share.

75. Between October 5, 2004 and April 18, 2006, Empire continued to issue quarterly dividends as follows, on or about the given dates:

a. January 1, 2005 $0.04 / share;

b. April 1, 2005 $0.04 / share;

c. July 1, 2005 $0.05 / share;

d. October 1, 2005 $0.05 / share;

e. January 24, 2006 $0.21 / share; and

f. April 1, 2006 $0.05 / share.

76. None of those dividends were allocated to Tertiaire's Empire Shares, or issued to Tertiaire or Developpement.

# **PROPOSED CONCLUSIONS OF LAW**

1. In 1986, the Delaware legislature overhauled the State's escheatment laws to address one single issue: "To Provide for the Escheat to the State of Intangible Ownership Interests in Corporation when Dividends or other Distributions thereon have been Abandoned." 65 Del. Laws, c. 351 (1986) (the "1986 Amendment").

2. Among other things, the 1986 Amendment:

   a. redefined "holder" to include "the issuer of any intangible ownership interest in a corporation" (65 Del. Laws, c. 351, § 1 (1986));

   b. established a separate, three-part definition of "full period of dormancy" applicable only to intangible ownership interests in a corporation (65 Del. Laws, c. 351, § 2 (1986));

   c. restricted holders of intangible ownership interests in a corporation from delivering such interests unless each part of the "full period of dormancy" definition was satisfied and, in the case of certificated securities, further required such holders to deliver ***either*** the original stock certificate if in their possession ***or*** a duplicate of it (65 Del. Laws, c. 351, § 4) (1986)); and

   d. limited the ability of holders and transfer agents who do not possess the ***original*** stock certificate to invoke the Section 1203 "relief from liability" by imposing upon them the burden of delivering the duplicate certificate in "good faith," a phrase it defined through a three-part test, each part of which must be satisfied (65 Del. Laws, c. 351, § 5 (1986)).

*See* 12 Del. C. §§ 1198(7), 1198(9)a.1-3; 1198(11)(iii), 1201(a)(1), & 1203(b)-(d).[1]

3. Intangible ownership interests in a Delaware corporation may be delivered to the State Escheator ***only*** as, when, and if they are deemed abandoned under Subchapter IV.

> (a) On or before the date required for the filing of the report pursuant to § 1199 of this title, every holder of abandoned property shall pay or deliver to the State Escheator all abandoned property specified in the report …. The holder of any intangible ownership interest in a corporation ***deemed abandoned under this subchapter*** shall, when making the delivery contemplated by this section:
> (1) If such interest is a certificated security as defined in § 8-102(a) of Title 6 deliver either the original stock certificate ***evidencing the abandoned property***, if such is in its possession or a duly issued replacement certificate evidencing such property in a form suitable for transfer.

12 Del. C. § 1201(a)(1) (emphases added).

4. Property is abandoned ***only*** as, when, and if a "full period of dormancy has run." 12 Del. C. § 1198(1).

5. The period of dormancy applicable to this case is five years. *A.W. Financial Services v. Empire Resources, Inc.*, 981 A.2d 1114, 1119-20 (Del. 2009).

6. Delaware law provides that,

> with respect to an intangible ownership interest in a corporation, whether or not represented by a stock certificate, ***the period of dormancy means a period of 5 years*** during which:

[1] The 1986 Amendments apparently were taken, almost verbatim, from the Uniform Unclaimed Property Act (1981) ("UUPA(1981)"). *See* UUPA(1981) §§ 1(10)(iii), 10, 19(d), 20(e) & 20(f)(1)-(3). As explained by the drafters:

> The 1966 Act provided a presumption of abandonment of unclaimed dividend or interest checks but arguably did not cover the underlying ownership interest represented by issued and outstanding securities certificates. In recent years several states have amended their statutes to authorize taking of this property and indications are that the trend is likely to continue. California, Florida, Indiana, Maine, Massachusetts, Montana, Rhode Island and Virginia have statutes with such provisions and other states are known to be considering similar proposals. ***The new Act specifically covers securities even though they are not in the possession of the issuer***. See Section 10.

UUPA(1981) at 7 (emphasis added).

> 1. The owner has not claimed a dividend, distribution or other sum with respect to such interest;
>
> 2. ***The owner has not communicated in writing with the holder concerning such property*** or otherwise communicated with the holder concerning such property which communication is evidenced by a writing or other record prepared by the holder or its employee in the ordinary course of business; ***and***
>
> 3. At the end of which ***the holder does not know the current location*** of the owner of such property.

12 Del. C. § 1198(9)a. (emphases added). Each of these three conditions must be met.

7. The first condition, that an owner has not claimed a dividend in five years, means the five-year period of dormancy starts to run ***only*** when an owner fails to claim a declared and distributed dividend. 12 Del. C. § 1198(9)a.1. This condition appears taken from Section 10(a) of the UUPA(1981).[2] The drafters of the UUPA(1981) explained the purpose of this condition.

> The existing underlying shares statutes make no formal distinction between dividend and nondividend paying stock and provide that the mere passage of time with no contact is sufficient to raise the presumption of abandonment. Section 10 combines both a period of inactivity, 7 years, with the requirement that distributions paid on the underlying intangible interest remain unclaimed, thus avoiding concerns that ***abandonment should not be presumed where a shareholder has not contacted a non-dividend paying company***.

UUPA(1981) § 10, Comment.

---

[2] Section 10(a) provides:

> [S]tock or other intangible ownership interest in a business association, the existence of which is evidenced by records available to the association, is presumed abandoned and, with respect to the interest, the association is the holder, if a dividend, distribution, or other sum payable as a result of the interest has remained unclaimed by the owner for 7 years and the owner within 7 years has not:
>
> (1) communicated in writing with the association regarding the interest or a dividend, distribution, or other sum payable as a result of the interest; or
>
> (2) otherwise communicated with the association regarding the interest or a dividend, distribution, or other sum payable as a result of the interest, as evidenced by a memorandum or other record on file with the association prepared by an employee of the association.

UUPA(1981) § 10(a). Delaware originally adopted the seven-year standard, but amended it to five years in 1988. *Compare* 65 Del. Laws, c. 351, § 2 (1986) *with* 66 Del. Laws, c. 379, § 3 (1988).

8. Empire declared its first-ever dividend on June 19, 2003. Consequently, under the first condition, the five-year "period of dormancy" could not expire until June 18, 2008. 12 Del. C. § 1198(9)a.1.

9. The second condition, that the owner has not communicated in writing with the holder concerning its property for a continuous period of five years, 12 Del. C. § 1198(9)a.2, means that any communication between the two starts anew the period of dormancy. This condition apparently was taken from Section 10(a)(1) and Section 10(a)(2) of the UUPA(1981).[3]

10. Tertiaire's successor in interest, Developpement, exchanged correspondence with Empire and its authorized agent, AST, regarding Tertiaire's Empire Shares in April, May and June 2000, culminating in Empire issuing a replacement original stock certificate (No. IT 0328) on May 30, 2000, which AST then sent to Developpement on June 4, 2000.

11. Under the second condition, a full period of dormancy could not have run against Tertiaire's Empire Shares prior to at least June 4, 2005. 12 Del. C. § 1198(9)a.2.

12. Developpement again communicated with Empire on January 9, 2002. Consequently, under the second condition, a full period of dormancy could not have run against Tertiaire's Empire Shares prior to January 9, 2007.

13. The third condition, that at the end of the five-year period of dormancy the holder does not know the current location of the owner, 12 Del. C. § 1198(9)a.3, means the holder must go beyond the "last known address" in its records (*cf*. 12 Del. C. § 1199(a)(1)) and, at minimum, search all its records to prove affirmatively that "the holder ***does not know the current location*** of the owner of the property." 12 Del. C. § 1198(9)a.3.

14. The correspondence from Developpment to Empire and AST in April, May and June 2000 – especially the Affidavit of Loss, the Surety Bond Premium Check, the Airborne

[3] For the text of these subsections, see footnote 2 *supra*.

Airbill and the FedEx Airbill – proves Empire and AST knew at least one location of Developpement in Paris, France. So too does the January 2002 letter from Developpement to Empire.

15. For each and all of the foregoing reasons, the five-year period of dormancy had not expired either by December 31, 2003 (when Empire and/or AST and/or ACS determined Tertiaire's Empire Shares were abandoned), or by October 20, 2004 (when one or more of them delivered Tertiaire's Empire Shares and Tertiaire's Empire Dividends to the Delaware Escheator).

16. Consequently, Empire and AST and ACS prematurely – and wrongly – determined Tertiaire's Empire Shares and Tertiaire's Empire Dividends were abandoned property.

***The Premature and Wrongful Escheatment Resulted from the Negligent Acts and/or Omissions of Empire, AST and/or ACS***

17. Under Delaware law, "To state a cause of action for negligence, the plaintiff must show (1) the existence of a duty; (2) breach of that duty; (3) proximate causation; and (4) damages." *Those Certain Underwriters at Lloyd's London v. Nat'l Installment Ins. Servs., Inc.*, 2007 WL 1207106 at *6 (Del.Ch. Feb. 8, 2007).

18. Empire, AST and ACS each owed duties to Tertiaire and its successors in interest.

19. As recognized by the Delaware Supreme Court, "the owner of securities [] usually must rely on third parties ***to monitor the ongoing status*** of this intangible property form …." *A.W. Financial Services*, 981 A.2d at 1131 (emphasis added).

20. In the context of escheatment, that duty to monitor falls, *inter alia*, upon the issuing corporation as the "holder" of those securities. 12 Del. Code § 1198(7).

21. Delaware law also imposes upon issuers duty to Tertiaire to maintain accurate books and records regarding ownership of shares. *See Rainbow Navigation, Inc. v. Pan Ocean*

*Navigation, Inc.*, 535 A.2d 1357, 1359 (Del. 1987) (Delaware corporation has affirmative duty to maintain a stock ledger).

22. Through the Delaware escheatment statutes, the Delaware legislature imposed upon corporations certain other duties to their shareholders, all of which are designed to protect the shareholder and prevent premature or improper delivery of shares to the Delaware Escheator. Sections 1198(9)a.1. and 1198(9)a.2., for example, impose a duty to maintain accurate records of not only dividend payments and whether they are claimed, but also communications between shareholder and corporation. They exist to prevent a premature determination that the full five-year period of dormancy has run. Section 1198(9)a.3. imposes a duty to provide written notice prior to escheatment so as not to deprive the shareholder of its opportunity to prevent a negligent determination of abandonment.[4] *See* 12 Del. Code §§ 1198(9)a. *See also*, *A.W. Financial Services*, 981 A.2d at 1131 ("third parties that are entrusted with overseeing securities belonging to others will not turn those securities over to the Escheator without first diligently ascertaining that the criteria for their proper escheat are satisfied").

23. In making the determination that a full five-year period of dormancy had run against Tertiaire's Empire Shares, Empire breached each of those duties.

24. Empire's role in or knowledge about the escheatment of Tertiaire's Empire Shares is determined by looking not only at Empire, but also at its agents because their acts, omissions,

---

[4] Sections 1198(9)a.1 and 1198(9)a.2 were drawn from Section 10 of the UUPA(1981) (the section pertaining to intangible ownership interests in a corporation) *Compare* 12 Del. Code §§ 1198(9)a.1-2 *with* UUPA(1981) § 10(a)(1)-(2). Section 1198(9)a.3., however, does not have a parallel in the text of Section 10 of the UUPA(1981). The Delaware legislature apparently relied upon a Comment to Section 10 of the UUPA(1981) to impose this third condition precedent to a determination that a full five-year period of dormancy had run.

> If the conditions leading to a presumption of abandonment have occurred, the holder (issuer of the security) must report to the state pursuant to Section 17, ***and if the holder has in its records an address of the owner, it must send written notice to the owner in an effort to reunite the owner with his property***.

UUPA(1981) § 10, Comment (emphasis added). Section 1198(9)a.3., therefore, is a notice requirement.

and knowledge are attributed to Empire by principles of the law of agency. "It is certainly true that a principal is liable for wrongs committed by its agents acting in the course of their agency." *Arnold v. Society for Sav. Bancorp*, 678 A.2d 533, 539 (Del. 1996) (citation omitted); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1062 n.83 (Del.Ch. 2004) (*citing* 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 790-91, at 14-18 (perm. ed., rev. vol. 2002) (stating the general rule that "a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation")).

25. "Delaware follows the 'but for' rule of proximate cause." *Pesta v. Warren*, 2005 WL 3453825 at *2 & n.7 (Del. Dec. 14, 2005) (*citing Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991) (defining the "but for" rule as "[t]he defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it")). But for Empire's negligent determination that a full five-year period of dormancy had run against Tertiaire's Empire Shares, those shares never would have been delivered to the Delaware Escheator, and Tertiaire/AWF never would have suffered damages.

26. Empire's acts and omissions caused Tertiaire/AWF to suffer the loss of an opportunity, a recognized injury. *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1090 (Del. Ch. 2004); *see also Carlton v. Choice Point*, 450 F. Supp.2d 489, 496-97 (D.N.J. 2006), *vacated in part on other grounds*, 482 F. Supp.2d 533 (D.N.J. 2007) (shares in corporation had been diverted by transfer agent to third party; during third party's possession, shares reached highest

value; court held that rightful owner of shares suffered injury from the loss of opportunity to sell them when they were at their highest value).

27. By its unilateral actions, Empire took possession, custody and control of Tertiaire's Empire Shares and, without notice to Tertiaire/AWF, negligently declared them to be abandoned, and delivered them to the Delaware Escheator.

28. AST, as Empire's transfer agent, also owed duties to Tertiaire/AWF. The adoption of the UCC abrogated the common law with respect to issue whether transfer agents owe duties to shareholders. *Kenner v. Canal Nat. Bank*, 489 F.2d 482, 485 n.3 (1st Cir. 1973) ("the UCC is clear in its intent to abrogate the common law immunity of transfer agents in suits brought by wrongfully injured shareholders").[5]

29. Delaware adopted the relevant provisions of the UCC. *See generally* 6 Del. C. § 8-401 *et seq*. Under the UCC, AST, as transfer agent, "owes a legally cognizable duty to Plaintiff." 6 Del. C. §§ 8-401, 8-407.

> A person acting as authenticating trustee, ***transfer agent***, registrar, or other agent for an issuer in the registration of a transfer of its securities, in the issue of new security certificates or uncertificated securities, or in the cancellation of surrendered security certificates ***has the same obligation to the holder or owner of a certificated or uncertificated security with regard to the particular functions performed as the issuer has in regard to those functions***.

6 Del. C. § 8-407 (emphases added). *Cohen v. Bankers Trust Co.*, 445 F.Supp. 794, 796 (S.D.N.Y. 1978) (Article 8 of the UCC applies to suit brought by shareholder of Delaware corporation against corporation's New York transfer agent) (interpreting Article 8 of the UCC as adopted by Delaware and New York, and deeming them to be "consistent … with respect to the issues raised herein, … obviat[ing] any question of conflicts of laws"). "By operation of [Section 8-407], a coextensive duty [with that of the issuer] is imposed upon the transfer agent

[5] A duty may arise from either the common law or a statute, and the breach of such duty may support a claim of ordinary negligence. *New Haverford P'ship v. Stroot*, 772 A.2d 792, 798 (Del. 2001).

…." *Kenner*, 489 F.2d at 485; *accord*, *Faro v. Corporate Stock Transfer, Inc.*, 883 So.2d 896, 898 (Fla. 3d DCA 2004).[6]

30. The Delaware escheatment statute also imposes duties upon transfer agents such as AST. Section 1203(b), for example, acknowledges the commercial reality that a transfer agent likely will act for the issuer "in executing or delivering [the] duplicate certificate" to the Delaware Escheator, and therefore relieves the transfer agent "of all liability of every kind to every person" ***if*** the delivery is made in good faith. 12 Del. C. § 1203(b).

31. At minimum, this language imposes upon AST the duty to act in good faith (as defined by Section 1203(d)) to the extent it was involved in executing or delivering a duplicate certificate of Tertiaire's Empire Shares to the Delaware Escheator.

32. "Good faith" requires satisfaction of three pre-conditions. 12 Del. C. § 1203(d)(1)-(3). AST, therefore, had a duty to Tertiaire/AWF to satisfy each one prior to executing or delivering a duplicate certificate.

33. Furthermore, the delivery itself appears to have been negligent. Where, as here, a certificated security is determined to be abandoned, and the original certificate for that security is not in the possession of the holder or transfer agent, then the holder or transfer agent must deliver "a duly issued replacement certificate" to the Delaware Escheator. 12 Del. C. § 1201(a)(1). AST, however, has admitted in open Court it did not deliver Tertiaire's Empire Shares in that manner. Order & Certificate of Questions of Law (Doc. No. 53) at 14 (*citing* Hr'g Jan. 27, 2008).

34. AST, therefore, negligently determined Tertiaire's Empire Shares and Tertiaire's Empire Dividends were abandoned, a determination that was the proximate cause of the damages to Tertiaire/AWF.

---

[6] To understand fully the "coextensive duty imposed upon the transfer agent," it is necessary to understand first the duty imposed upon the issuer by Section 8-401. An issuer's duty is not limited to the items enumerated in Section 8-401. "[I]t is reasonable to construe the term 'register the transfer', as used in § 8-401 of the UCC, to include those ministerial acts that normally accompany such registration, including, where applicable, the issuance of a new certificate." *Bender v. Memory Metals, Inc.*, 514 A.2d 1109, 1115 (Del.Ch. 1986).

35. AST delegated to ACS part of its authority to act for Empire. ACS participated in the negligent determination that Tertiaire's Empire Shares and Tertiaire's Empire Dividends were abandoned.

36. Furthermore, wearing its other hat, as an independent contractor for Delaware, ACS owed AWF/Tertiaire duties specified in the Delaware escheatment statute, such as analyzing the abandoned property report filed by Empire and/or AST. *See* 12 Del. C. § 1199(a). *Higgins v. Walls*, 901 A.2d at 143-44 (an independent contractor engaged by Delaware owes a duty to individual plaintiffs to perform those ministerial tasks properly). Given the fact that there was a wrongful escheatment, it obviously breached those duties.

***Empire, AST and ACS converted Tertiaire's Empire Shares and Tertiaire's Empire Dividends***

37. Delaware recognizes a cause of action in conversion for the wrongful alienation of stock. *Segovia v. Equities First Holdings, LLC*, 2008 Del. Super. LEXIS 197, *67-71 (May 30, 2008).

38. "Conversion" under Delaware law results from "any distinct act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it." *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933).

39. Empire, AST and ACS each converted Tertiaire's Empire Shares and Tertiaire's Empire Dividends by wrongfully exerting dominion over the Empire Shares, stock in which AWF had a property interest and a right to possess. *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996).

40. Empire, through AST and ACS, prevented the issuance and mailing of Tertiaire's Empire Dividends, determined Tertiaire's Empire Share and Tertiaire's Empire Dividends were abandoned even though the five-year period of dormancy had not run, cancelled Certificate Number IT 0328 (representing Tertiaire's Empire Shares), issued a new certificate (No. IT 363)

that agglomerated Tertiaire's Empire Shares with more than 50,000 other Empire shares, and by delivering that new certificate to the Delaware Escheator, escheated Tertiaire Empire Shares and Tertiaire's Empire Dividends.

The elements of conversion are satisfied also by the undisputed fact that ACS – through its contract with Delaware – had the authority and duty to determine whether property being delivered to the State was, in fact, abandoned. 12 Del. C. § 1199. The exercise of that authority and duty in such a way as to cause the State to accept delivery of tendered property necessarily is an act of control or dominion over the subject property. ACS accepted Tertiaire's Empire Shares even though a full five-year period of dormancy had not run against them.

41. The defendants, therefore, wrongfully exerted dominion over the Empire Shares. *See Data Management Internationalé, Inc. v. Saraga*, 2007 WL 2142848 at *4 (Del.Super. Jul. 25, 2007)(exerting dominion over personal property of another wrongfully determined to be abandoned gives rise to cause of action in conversion).

***Empire Failed to Register Tertiaire's Empire Shares in the name of Developpement***

42. Delaware imposes a duty upon corporations (and, possibly, transfer agents) to register shares. 6 Del. C. §§ 8-401 *et seq.*

43. The breach of that duty gives rise to a cause of action for failure to register share certificates. *Bender v. Memory Metals, Inc.*, 514 A.2d 1109, 1115 (Del.Ch. 1986).

44. Empire (and AST) failed to register the replacement original certificate for Tertiaire's Empire Shares, Certificate Number IT 0328, in the name of Developpement.

45. That failure was a breach of their duty to register shares.

46. That breach was the proximate cause of the damages suffered by Tertiaire/AWF, because it resulted in the failure to update the "address of record" for Tertiaire's Empire Shares.

***The Defendants May not Escape Liability by Claiming Statutory Immunity***

47. The Delaware Supreme Court held the "absolute immunity" provision set forth in Section 1203(a) of the Delaware Escheat law doe ***not*** apply to the escheatment of shares in a corporation, and only the "qualified immunity" provision in Section 1203(b) would apply in such an instance. *A.W. Financial*, 981 A.2d at 1128-31.

48. Section 1203(b) immunity, however, is available only to a holder (Empire) or transfer agent (AST) who satisfies each element of the "good faith" standard set forth in Section 1203(d). 12 Del.C. § 1203(b).

49. Given the facts underlying the premature and wrongful escheatment of Tertiaire's Empire Shares, the defendants cannot satisfy the good faith standard.

50. Section 1203(b) reads:

> Upon the delivery ***in good faith*** of ***a duplicate certificated security to the State Escheator*** … ***pursuant to § 1201*** hereof, the holder and any transfer agent … is relieved of all liability of every kind to every person … for any losses or damages resulting to any person ***by issuance and delivery to the State Escheator of the duplicate certificated security*** ….

12 Del. C. § 1203(b) (emphases added).

51. The first element of the good faith test requires the holder to demonstrate the delivery of the Empire Shares to the Delaware Escheator "was made in a reasonable attempt to comply" with the provisions of Subchapter IV of the Delaware Escheat law. 12 Del. C. § 1203(d)(1).

52. Given that Empire (and/or AST and/or ACS) wrongly determined Tertiaire's Empire Shares were abandoned years before a full five-year period of dormancy had run, and made that determination without any attempt to contact Tertiaire at its address in Paris, France, the delivery of Tertiaire's Empire Shares was not made in a

reasonable attempt to comply with the Delaware Escheat law. On that basis alone, the defendants cannot satisfy the good faith standard.

53. Furthermore, even assuming *arguendo* defendants could satisfy the good faith standard, it appears they failed to deliver to the Delaware Escheator that which is statutorily required: a "duplicate certificated security … pursuant to § 1201." 12 Del. C. § 1203(b).

54. Where, as here, a certificated security is determined to be abandoned, and the original certificate for that security is not in the possession of the holder or transfer agent, then Section 1201 requires the holder or transfer agent to deliver "a duly issued replacement certificate" to the Delaware Escheator. 12 Del. C. § 1201(a)(1). Counsel for AST, however, previously admitted in open Court it did not deliver Tertiaire's Empire Shares in that manner. *See* Order & Certificate of Questions of Law (Doc. No. 53) at 14 (*citing* Hr'g Jan. 27, 2008). Consequently, independent of their inability to satisfy the good faith standard, the defendants also appear unable to invoke Section 1203(b)'s qualified immunity because they failed to comply with Section 1201.

55. For either of these reasons, the defendants cannot successfully invoke Section 1203(b) to claim immunity from liability for their premature escheatment of Tertiaire's Empire Shares and Tertiaire's Empire Dividends.

***AWF's Calculation of Damages***

56. "[T]he measure of damages for wrongful conversion of stock is either (1) its value at the time of conversion or (2) its highest intermediate value between notice of the conversion and a reasonable time thereafter during which the stock could have been replaced had that been desired, whichever of (1) or (2) is higher." *Schultz v. Commodity Futures Trading Comm'n,* 716 F.2d 136, 141 (2d Cir. 1983) (citation omitted).

57. The "highest intermediate value" rule for the wrongful conversion of stock is the law of not only the Second Circuit, but also Delaware and New York. *Segovia v. Equities First Holdings, LLC*, 2008 Del. Super. LEXIS 197 at *75 (May 30, 2008) ("This damages model is premised upon the idea that 'the risk of fluctuations in the market should be borne by the wrongdoer.' What constitutes a reasonable period of time is a question of law for the court to determine.") (footnotes and citations omitted); *Matter of Rothko*, 56 A.D.2d 499, 503 (1st Dep't) (citations omitted), *aff'd*, 43 N.Y.2d 305 (1977).

58. Furthermore, "the injured party is not actually required to reenter the market in order to determine when he might have done so." *Schultz*, 716 F.2d at 140.

59. AWF first learned of the wrongful escheatment (i.e., conversion) in April 2006.

60. The highest intermediate value between notice to AWF and a reasonable period time thereafter (occurring on May 3, 2006) was $57.87 per share.

61. Multiplying that share price by 30,426 shares yields a share value of $1,760,752.62. Subtracting from that amount the $117,250.83 AWF recovered from the Delaware Escheator results in base damages for the wrongful escheatment of Tertiaire's Empire Shares in the amount of $1,643,501.79.[7]

***Pre-Judgment Interest***

62. Both Delaware and New York law mandate the award of pre-judgment interest where, as here, the owner of shares in a corporation wrongfully is alienated from such property. *Segovia*, 2008 Del. Super. LEXIS 197 at *80-81 ("Pre and post judgment interest ***must*** be awarded here. Mrs. Segovia is entitled to prejudgment interest at the 'legal rate' on her conversion damages.") (emphasis added); N.Y. C.P.L.R. § 5001(a) ("Interest ***shall*** be recovered

[7] AWF also is entitled to damages in an amount equal to the dividends declared and distributed between the date Empire (and/or AST) ceased paying dividends on Tertiaire's Empire Shares and May 3, 2006, as well as pre-judgment interest on that amount.

upon a sum awarded … because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property") (emphasis added).

63. Under Delaware law, pre-judgment interest in cases such as this one is a matter of right. *Segovia*, 2008 Del. Super. LEXIS 197 at *81-82; *Ashby Geddes, P.A. v. Portnoy*, 2010 Del. Super. LEXIS 513 (Del. Super. Nov. 30, 2010); *GyneConcepts, Inc. v. Kim*, 2010 Del. Ch. LEXIS 168 (Del.Ch. Aug. 17, 2010).

64. Interest is to be calculated at the "legal rate." *Segovia*, 2008 Del. Super. LEXIS 197 at *81.

65. The "legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due." 6 Del. C. § 2301(a).

66. The Federal Reserve discount rate as of May 3, 2006 was 5.75%.[8] Under Delaware law, pre-judgment interest is calculated at the legal rate of 10.75% from May 3, 2006.

Dated: New York, New York
December 23, 2011

/s/

Jon Schuyler Brooks (JB7218)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, New York 10103
(212) 977-9700 (phone)
(212) 262-5152 (fax)

*Attorney for Plaintiff*
*A.W.F. S.A. a/k/a and d/b/a*
*A.W. Financial Services, Inc.*

[8] http://www.federalreserve.gov/newsevents/press/monetary/monetary20060606a1.pdf